WILLIAM VON ROSENBERG v. L. HAYNES ET AL.

No. 8186.

1. **Evidence — Copies of Copies.** — Under ordinary circumstances, and under former decisions, copies taken from copies are inadmissible. But in view of more than a century's possession and continuous assertion of title under claim of right such as the originals of the copies would evidence, the admission of such remote copies can not be regarded as error.

2. **Archives in Land Office — Case Adhered to.** — Downing v. Diaz, 80 Texas, 436, adhered to, holding that the collection made by J. L. Haynes, and reported to be filed in the Land Office, of proceedings had in founding towns upon the Rio Grande (Laredo and Guerrero), fixing their jurisdiction, granting them lands, etc., became archives in the Land Office, and certified copies therefrom are competent in evidence whenever relevant.

3. **Relevant Testimony.** — The land grants in controversy are bounded on the north by Laredo, on the south by Guerrero, and on the west by the Rio Grande; and in so far as the proceedings relating to either of these towns and their inhabitants may tend to show a recognition by the Spanish government of the rights of the grantee at that early day, or to show the boundaries of his claim, they can not be deemed irrelevant. Besides, they may aid in establishing a grant upon the presumption of possession.

4. **Same.** — The effect of such ancient records is increased when they tend to show a recognition by the Spanish government of the right of the grantee at that early day; and that at so remote a period his claim was recognized by the

officers of the government having power to grant lands, and charged with the duty of protecting the interests of the sovereign.

5. **Royal Commission Establishing Towns on the Rio Grande.** In 1767 the royal commission reached Laredo, for the purpose of establishing towns and granting lands. The proceedings of the commission show that the land in litigation was occupied by Borrego (the grantee), recite that the land had been granted to him, and that a part of the grant under the law was expropriated so as to form part of the town. These transactions were pertinent, and the testimony relevant.

6. **Transactions Relevant.** — Upon the issue of the existence of grants, one in 1750, another in 1753, to Borrego of 75 leagues on left bank of the Rio Grande, and between the towns of Laredo and Guerrero, founded in 1767, a letter from the officer who extended title, and dated subsequently, addressed to a surveyor. directing the erection of monuments for corners, etc., of the surveys, is competent and relevant. So also proceedings instituted in 1828 and in 1829, for the purpose of ascertaining whether the lands belonged to the heirs of the original grantee—reciting testimony taken, the action of the governor and authorities recognizing the validity of the Borrego grants, and the locality.

7. **Transactions Held Relevant.**—The proceedings and decrees. as well as the evidence on which the decrees were based (in 1828 and 1829) in accordance with the decrees, were filed in the archives of Laredo at the time, a copy of which then made and retained, whence was taken the copy used on the trial of the cause below. This copy was competent and relevant.

8. **Archives — Copies.** — That the paper archived at Laredo may have been a copy of the original papers is a matter of no consequence in this case; for it is just what the authorities of that day deemed necessary and proper there to place as an evidence of right; and at this day it will be conclusively presumed that they acted in accordance with the laws then in force.

9. **Same.**—The archive at Laredo was evidence of right when and under the circumstances that gave it existence, and the lapse of fifty-eight years since that time, with continuous possession and assertion of claim under the grants, the existence of which the government recognized, has but added to the probative force of the archive.

10. **Same.**—The highest authorities in the State (in 1828 and 1829) acted, made decrees, and directed that they be archived at Laredo, for the very purpose for which copies from the archive and the archive itself were used, and it can not be presumed that these officials exceeded their powers.

11. **Official Acts of Former Government.**—After the lapse of over a century, followed by possession under a grant executed under the Spanish government, it ought not to be claimed that the officer extending the grants did not have power to do so, or to direct them to be surveyed, or to appoint a surveyor and give him instructions touching his survey. A testimonio of the acts of such officer in appointing surveyor, etc., would prove itself after the lapse of time here elapsing.

12. **Same — Letter of Officer Extending Title Ordering Survey.** It is not a reason for excluding such letter, over one hundred years old, directed to an officer, directing a survey and indicating the situation, quantity, and general boundaries, that no evidence was produced that a survey was made, or that the paper was produced by holders under the grantee, or that it was written upon unstamped paper, or that the letter in itself did not show title.

13. **Unauthorized Surveys.**—In 1874 and 1875 surveys were made by the surveyor of the county where the lands are situated. The lands were granted, if

at all, in 1750, 1753. *Held,* that such survey was not authorized by law, and the same did not become an archive when deposited in the Land Office.

**14. Patents for Adjoining Lands.** — It was not error to admit patents the field notes of which call for the grant sought to be established.

**15. Possession and Claim.** — Transactions prior to 1833 among heirs of the grantee, and with others, tending to show possession and assertion of ownership, were competent; and question of original and secondary character of such ancient documents is not material.

**16. General Visita—Cases Adhered to.**—Railway v. Jarvis, 69 Texas, 527; Downing v. Diaz, 80 Texas, 436, adhered to, in holding that the proceedings of the general visita copied from the archives at Laredo, and filed in the General Land Office, became archives in the Land Office. The testimony was relevant, in that the proceedings showed a recognition of the Borrego grants.

**17. Reputation as to Boundaries.** — It was competent for witnesses to testify to locality of boundary lines or corners from reputation, and from declarations by their ancestors, witnesses' knowledge extending over thirty years. So of occupation by tenants upon any part of the grant holding under it.

**18. Fact Case—Evidence of Grant.**—See facts sufficient to sustain the findings of the trial court that the grants (one for 50 leagues and another for 25 leagues adjoining) were made to Borrego as early as 1757, and that in 1829 the grants were recognized as valid by the State of Tamaulipas; that the boundaries were fixed and ascertained, the original grant being lost.

**19. Long Possession as Evidence of Grant.** — If there was no evidence tending to show that a grant was actually made to Borrego, the possession shown to have existed for a century and a quarter under claim of right to fixed boundaries furnishes evidence on which no court ought to hesitate to presume a grant.

APPEAL from Webb. Tried below before Hon. J. C. RUSSELL.

*Walton, Hill & Walton* and *Coopwood & Son,* for appellant.—1. An instrument in writing purporting to be a copy of a copy in the third degree, unauthorized by law, with neither its pretended original nor any one of the intermediate copies produced or accounted for, and neither the execution nor genuineness of such instrument, or of such pretended original or either of such intermediate copies, being proven or attempted to be shown, is utterly incompetent, and can not be used as an instrument of evidence for any purpose whatever. The State v. Cardenas, 47 Texas, 287; The State v. Cuellar, 47 Texas, 302; The State v. Sais, 47 Texas, 317; The State v. Bustamente, 47 Texas, 322; Ballard v. Perry, 28 Texas, 347; United States v. Le Blanc, 12 How., 435; Peralta v. United States, 3 Wall., 434; United States v. Gomez, 3 Wall., 752; Pico v. United States, 2 Wall., 279.

2. A mere copy of a copy, purporting to be made in a different province from that in which the land was situated, without any authority of law, at the verbal request of some person, from a copy in the hands or private custody of such person, and not upon the stamped or sealed paper requisite at the time to the validity or legality of any such instrument,

produced from the private custody of the party offering it, is not such as is or can be made capable of being used in evidence as an ancient instrument, and its admission in evidence was error, to the injury of plaintiff's rights. Jones v. Garza, 15 Texas, 351; Megan v. Boyle, 19 How., 131; The State v. Cardenas, 47 Texas, 287–291; The State v. Cuellar, 47 Texas, 302–306; Law 5, Tit. 24, Lib. 10, Nov. Rec.; Escriche's Dic., Verbo Papel Sellado.

3. The instrument the admission of which is complained of only purports to be copies of copies of extracts or excerpts from some other document or collection of papers, parts of which are omitted or suppressed, and it purports to be certified by Juan Muniz to "agree with the original grants that remain in the archives of this government under my charge," without showing the date when or place where such copy was so made by him, or how he came to be, or that he really was, in charge of the government of any province; and it is such an instrument as would be rejected as false under the law when and where it purports to have been made. Febrero Novisimo, vol. 3, pp. 258, 283; Laws 36 and 44, Tit. 18, Part. 3; The State v. Cuellar, 47 Texas, 302, et seq.

4. Both of the pretended grants set out in this copy appear on their face to contemplate and require further action on part of the government, and to be, from their own terms, incomplete and inchoate, and if they were produced they would not be cognizable in the courts of the country. Hancock v. McKinney, 7 Texas, 457; The State v. Sarnes, 47 Texas, 324; Paschal v. Perez, 7 Texas, 366; Hosner v. De Young, 1 Texas, 769; Const. 1875, art. 16, sec. 18.

5. Neither of the pretended grants set out in this copy purports to have been made in conformity with the law in force when and where they purport to have been made, but they both appear, from their own terms, to have been made in violation of the law then and there in force, and if produced according to the rules of evidence, they would be void for want of authority. Cedula of Nov. 24, 1735; Royal Instructions of Dec. 15, 1754; Ordenanza de Intendentes, Dec. 4, 1786, and especially art. 81; Tit. 12, Lib. 4, Recopilacion de Indias; Ordenanza of Felipe II on same subject, 1563.

6. If this instrument were otherwise admissible, the archive from which the Muniz copy purports to have been taken would have to be accounted for, as the primary evidence of its contents, before it could be legally admitted. Thompson v. Shannon, 9 Texas, 538, 539; Mitchell v. Napier, 22 Texas, 129; Winn v. Patterson, 9 Pet., 663; United States v. Delespain's Heirs, 12 Pet., 654; Catlin v. Underhill, 4 McLane, 199; Lewis v. Baird, 3 McLane, 56; Comstock v. Carnley, Bl. C. C., 58; The State v. Cuellar, 47 Texas, 302; The State v. Bustamente, 47 Texas, 322.

7. Color of title is that which in appearance is title, but which in reality is not title. It is that which the law will consider prima facie a good

title, but which, by reason of some defect not appearing on its face, does not in fact amount to title.   An absolute nullity, as a void deed, judgment, etc., will not constitute color of title; and this instrument, the admission of which is complained of in this first assignment of error, when viewed in the light of the law, which must be noticed by everybody, can not be used as color of title to shield the defendants.   Bernal v. Glein, 33 Cal., 676; Jackson v. Woodruff, 1 Cow., 276; Jackson v. Frost, 5 Cow., 583; Jackson v. Waters, 12 Johns., 365; Levingston v. Iron Co., 9 Wend., 511; Walker v. Turner, 9 Wheat., 541–552; Moore v. Brown, 11 How., 425; Linsey v. Miller, 6 Pet., 666; Galaway v. Finley, 12 Pet., 299; Hanrick v. Dodd, 62 Texas, 91; Jackson v. Ingraham, 4 Johns., 182; The State v. Delesdenier, 7 Texas, 108; Mason v. Russell's Heirs, 1 Texas, 721; Todd v. Fisher & Miller, 26 Texas, 241.

8.  The then well ascertained written statutory laws of the State of Tamaulipas and of the Republic of Mexico did not authorize such proceedings as purport to be set out in this document; and when these proceedings purport to have been had, all authority for continuing the course of designations of land made, but not perfected, under the former government of Spain, for the purpose of perfecting or confirming the titles thereto, had expired, and no confirmation or perfect adjudication of title to any such extent of territory or area of land as that pretended to be claimed under these papers was ever made or authorized to be made under the laws of the Republic of Mexico or State of Tamaulipas; but such claims were left to depend upon whether they were completed, so as to vest in the claimant the title of the former sovereignty in perfect dominion, or were merely inchoate and incapable of judicial cognizance. Decree of Emperor Augustine, Jan. 18, 1823, Pasch. Dig., art. 520; Decree 72, Federal Government, Pasch. Dig., arts. 545, 554; Chambers v. Fisk, 22 Texas, 528; United States v. Hartnell, 22 How., 289; Colonization Law of Tamaulipas, Pasch. Dig., arts. 783–789; Pasch. Dig., art. 4469; United States v. Osio, 23 How., 273; United States v. Neleigh, 1 Bl., 298; The State v. Cardenas, 47 Texas, 283, et seq.; The State v. Cuellar, 47 Texas, 302, et seq.

9.  This document, the admission of which is complained of in the second assignment of error, nowhere pretends to be a grant, or a confirmation or perfection of such, nor does it contain any description of the land or provision for its survey and identification; and if it were true, it is simply an attempt at an ex parte proceeding to perpetuate testimony, and is not, and can not be made to constitute, title to land or a constituent element of such.   Colonization Law of Tamaulipas, Pasch. Dig., arts. 783–789; Buyck v. United States, 15 Pet., 220; United States v. Delespain, 15 Pet., 328; O'Hara v. United States, 15 Pet., 279; United States v. Meranda, 16 Pet., 155; Bisell v. Penrose, 8 How., 317; Villalobos v. United States, 10 How., 541; United States v. King, 3 How., 773; United

States v. Bordoue, 11 How., 63; Lecompte v. United States, 11 How., 115; United States v. Lawton, 5 How., 10.

10. If the governor and alcalde, or either of them, had attempted to make the instrument referred to in this assignment a grant, or a confirmation or perfection of such, then such act would not only have been without any authority of law, but against the plain written law of both State and Federal governments, and would be void under all governments. Arredondo's case, 6 Pet., 728; League v. Edger, 24 How., 264–267.

11. The power in the governor and alcalde to confirm or make such a grant would have been an exception to all the laws and usages on the subject at the time, and the party claiming the benefit of such exception ought to show that it really existed. The presumption in favor of the legality of the acts of an officer, of itself, would not supply the want of such proof. Jones v. Garza, 11 Texas, 209; Jones v. Meusbach, 26 Texas, 236; United States v. Cambuston, 20 How., 63; Holliman v. Peebles, 1 Texas, 699; United States v. Castro, 24 How., 346.

12. The instrument mentioned being void for want of authority to make or confirm such a grant, it conferred no right, passed no title, and can afford no protection to the defendants. League v. De Young, 2 Texas, 497; Bryan v. Shirley & Mayhoff, 53 Texas, 458; The State v. Delesdenier, 7 Texas, 76; Bryan v. Crump, 55 Texas, 11; Hanrick v. Jackson, 55 Texas, 29; Atkinson v. Ward, 61 Texas, 387; Todd v. Fisher & Miller, 26 Texas, 241; Mason v. Russell's Heirs, 1 Texas, 721.

13. If this instrument [copy made in 1829] related to a title to land in Texas, emanating from a former government, it is not and does not purport to be such a testimonio or original copy as could be delivered to the claimant, and if it were an archive, it should be in the General Land Office, and not in the private custody of the defendants, and when produced in court by them and offered in evidence, "without stating for what purpose," it was not competent as evidence at all; and the fact of its being found in the office of the district clerk, among some old city papers, since the filing of this suit, and by him turned over to counsel for defendants in this suit, adds no force or effect to it, but amounts to a badge of fraud. Pasch. Dig., arts. 69, 70, 71; Smith v. Power, 2 Texas, 70.

14. A private survey made without any authority of law, though made by one who is a district or county surveyor, for or at the instance of parties claiming an interest in the land, and not proved by any testimony whatever dehors the face of the field notes thereof so made, is not independent evidence of the facts stated in such field notes, but is incompetent as evidence against third parties, even to show boundary, and is a nullity. Block v. Doherty, 5 Wheat., 359; Meehan v. Forsyth, 24 How., 175; Johnston v. Jones, 1 Bl., 209; Linn v. Scott, 3 Texas, 67; Hughes v. Perry, 21 Texas, 778; Jenkins v. Chambers, 9 Texas, 167; Magee v. Chadoin, 30 Texas, 644; United States v. Hanson, 16 Pet., 198–202;

United States v. Levy, 8 Pet., 479; United States v. Huertas, 9 Pet., 180; Villalobos v. United States, 10 How., 541; United States v. Segui, 10 Pet., 306; United States v. Seaton, 10 Pet., 309; United States v. Breward, 16 Pet., 143; United States v. Sibbold, 10 Pet., 313.

15. When, by their pleadings and the pretended documentary evidence already produced by them and read in evidence, defendants had shown that the facts they relied on, if they had been true and admissible in evidence, were merely preliminary steps towards obtaining a grant, in an irregular manner, and also showed that no final grant was procured, oral testimony offered for the purpose of raising a presumption of a grant of land is incompetent and irrelevant, and ought to have been excluded; and it is not competent to prove title to land by oral testimony when no title is averred or pretended to be shown to have existed of record.   Ballard v. Perry, 28 Texas, 348; United States v. Castro, 24 How., 346; United States v. Knight, 1 Bl., 227; United States v. Vallejo, 1 Bl., 541; United States v. Neleigh, 1 Bl., 298; White v. United States, 1 Wall., 660; Romero v. United States, 1 Wall., 721; Pico v. United States, 2 Wall., 279; Peralta v. United States, 3 Wall., 438; United States v. Gomez, 3 Wall., 752.

16. The presumption of a grant can never fairly arise where all the circumstances are consistent with the nonexistence of a grant, nor where the claim is of such a nature as is at variance with the fact of a grant; and it can not be raised upon an inchoate or imperfect grant; and it is repelled by a failure to prove the genuineness of the documents under which the party claims.   Watkins v. Taylor, 26 Texas, 688; Paschal v. Perez, 7 Texas, 348; Luco v. United States, 23 How., 543; United States v. Rose, 23 How., 273; Palmer v. United States, 24 How., 131; United States v. Castro, 24 How., 352.

*McLane & Atlee*, for appellees.— 1.  An ancient document offered in evidence by the heirs and assigns of the original grantee of the lands therein referred to, who show their possession and other acts of ownership and enjoyment of such lands, under claim of title, for more than one hundred years, is admissible in evidence in an action against them to try title thereto.

2.  A certificate made by the Governor of Coahuila on the 16th day of January, 1779, is admissible without proof of its execution, and when accompanied by proof of possession and acts of ownership, under claim of title of the lands referred to, and other corroborating evidence of its genuineness, the document so certified to and the certificate is admissible as an ancient instrument.

3.  Lands in possession for more than one hundred years by persons claiming under an inchoate title are protected by the Constitution against location, survey, or patent by individuals.  Herndon v. Casiano, 7 Texas,

323; Paul v. Perez, 7 Texas, 338; Paschal v. Perez, 7 Texas, 347; Edwards v. James, 7 Texas, 372; Jones v. Montes, 15 Texas, 352; De Leon v. White, 9 Texas, 600; Titus v. Kimbro, 8 Texas, 213; Smith v. Townsend, 9 Dallam, 569; Houston v. Perry, 2 Texas, 39; 1 Gr., 141, et seq.; Hanrick v. Cavanaugh, 60 Texas, 1; Const., art. 14, sec. 2, art. 13, sec. 4; Day Land and Cattle Company v. State, 68 Texas, 526; Trueheart v. Babcock, 51 Texas, 169; Summers v. Davis, 49 Texas, 541.

4. An archive of an alcalde's office of a former government, made in the year 1829, proved to be genuine, and a testimonio thereof made in the year 1829, also proved to be genuine, are each admissible in evidence, and would be admissible as ancient instruments under the facts proven in this case without proof of their execution. Herndon v. Casiano, 7 Texas, 323; Smith v. Townsend, Dallam, 569; Paschal v. Perez, 7 Texas, 347; Edwards v. James, 7 Texas, 372; Houston v. Perry, 2 Texas, 39; Titus v. Kimbro, 8 Texas, 210; Ward v. McKinney, 25 Texas, 258; De Leon v. White, 9 Texas, 598; Andrews v. Marshall, 26 Texas, 212; Wood v. Welder, 42 Texas, 396; Hatchett v. Conner, 30 Texas, 104.

5. When in a proceeding had to denounce lands under the colonization laws of Tamaulipas, opposition was made thereto by the proprietor, the executive was clothed with power to examine and decide, and his judgment and construction of the law will not be disturbed, unless clearly shown to be void; and the title so recognized is protected by the treaty of Guadalupe Hidalgo. Pasch. Dig., art. 767; Hancock v. McKinney, 7 Texas, 384; Holliman v. Peebles, 1 Texas, 673; State v. De Leon, 64 Texas, 553; Hanrick v. Jackson, 55 Texas, 17; Clark v. Hills, 67 Texas, 144.

6. An order of survey, made in 1757, by the Governor of New Santander, acting as judge ex officio, of lands within said province, state, or colony, is made by competent authority, and a testimonio thereof, in custody of the heirs and assigns of the original grantee named in said order of survey, accompanied by evidence of possession of said lands under claim of title, is admissible as an ancient instrument, and is evidence of the existence of a grant at that time. Herndon v. Casiano, 7 Texas, 323; Titus v. Kimbro, 8 Texas, 210; Land Law in California, Oregon, and Texas, vol. 1, title 8; 1 Greenl. Ev., 141, et seq.

7. Actual possession under a claim of title or right to land, issued prior to November 13, 1835, saves to the claimant all rights and presumptions arising from such possession; and field notes of surveys made by a lawful surveyor for such claimant in possession are not inhibited by section 4, article 13, of the Constitution, and a certified copy of such field notes from the General Land Office is admissible in evidence. Const., arts. 13 (sec. 4), 14 (secs. 2, 8); Decourt v. Sproul, 66 Texas, 368; Cattle Co. v. The State, 68 Texas, 526; Jenkins v. Chambers, 9 Texas, 233; Titus v. Kimbro, 8 Texas, 210; Gonzales v. Ross, 120 U. S., 615; Strother v. Lucas, 12 Pet., 410.

8. Testimonios of conveyances of lands made under the former governments are receivable in all respects as originals; and when they are ancient instruments proof of their execution is not required; and when accompanied by evidence of long and notorious possession of the lands referred to therein under claim of title, they are admissible as evidence in support of such possession, and as acts of ownership and dominion over the lands at the time they were made; and likewise a certified copy of a survey of a portion of said lands is also admissible.  Herndon v. Casiano, 7 Texas, 323; Paschal v. Perez, 7 Texas, 347; Edwards v. James, 7 Texas, 371; Houston v. Perry, 2 Texas, 39; Smith v. Townsend, Dallam, 569; Wood v. Welder, 42 Texas, 396; Andrews v. Marshall, 26 Texas, 212; Titus v. Kimbro, 8 Texas, 210; De Leon v. White, 9 Texas, 598; Hatchett v. Conner, 30 Texas, 104; Ward v. McKinney, 25 Texas, 258; 1 Greenl. Ev., 141.

9. All papers appertaining to the lands of the Republic or State of Texas, that have been deposited or filed in the General Land Office in accordance with any law of the Republic or State, are archives; and a certified copy by the Commissioner of a transcript of the charter or general visita of Laredo, certified by the authorities thereof to be correct, and filed in the General Land Office on the —— day of December, 1871, under authority of the Act of April 24, 1871, is admissible in evidence. Pasch. Dig., art. 5826; Rev. Stats., arts. 57 (sec. 3), 2252 (secs. 3–9).

10. A copy made in 1848 by a notary public of the testimonio taken from the archives of San Carlos in 1782, accompanied by proof of possession of the lands therein referred to under claim of title, is admissible as an ancient document; and when proved by the testimony of the notary to be an exact copy of its original, its admissibility is not affected by the failure to produce its original, when such nonproduction is reasonably accounted for under all the facts and circumstances in evidence.  Mills v. Herndon, 60 Texas, 353; Pasture Co. v. Preston & Smith, 65 Texas, 448; Cox v. Cock, 59 Texas, 521; Glasscock v. Hughes, 55 Texas, 461; Brown v. Simpson's Heirs, 67 Texas, 231; Johnson v. Timmons, 50 Texas, 521; Williams v. Conger, 49 Texas, 582; Gainer v. Cotton, 49 Texas, 101; Stroud v. Springfield, 28 Texas, 649; Watrous v. McGrew, 16 Texas, 506; 1 Greenl. Ev., sec. 141.

STAYTON, Chief Justice.—Appellant having made locations by virtue of thirty-seven land certificates on the land in controversy, Haynes, the surveyor of the county, refused to make surveys under the locations, on the ground that the land covered by the locations was titled land; whereupon this action was brought to compel him to make and return surveys.

The claimants of the land and the surveyor were made parties defend-

ant, and on trial, without a jury, the court held that the land was not subject to location.

It was claimed by defendants that the land covered by the locations was a part of two grants made to Jose Basquez Borrego by the Spanish government, on August 22, 1750, and February 15, 1753.

The questions presented relate to the introduction of evidence and the sufficiency of the evidence to sustain the court's findings; and in the disposition of the case we will not attempt to follow in detail the many assignments of error; but, having considered them all, will notice the leading questions in the case.

In support of the two grants claimed to have been made to Jose Basquez Borrego, under whom appellees other than the surveyor claim, two papers were received in evidence which purported to be copies of grants to him made by Jose de Escandon, who doubtless had authority to make such grants.

The copies that were admitted in evidence purported to have been made January 16, 1779, by Juan D. Ugalde, who was at that date political and military governor of the province of Nueva Estramadura, then also known as Coahuila, and they were copied from what purported to be copies of the protocols made by a person who declared that he was the custodian of the archives of the government in which the protocols were.

Many objections were made to the papers offered, which, in view of the other evidence in the case, were clearly untenable; but it was contended, that the copies received in evidence were too remote to be entitled to admission, and it must be conceded that under ordinary circumstances the former decisions of this court would require the exclusion of such copies. The State v. Cardenas, 47 Texas, 287.

In view, however, of other questions involved in the case, we do not deem it necessary to decide whether the copies offered in evidence may not have been admissible for some, if not for all, purposes under the rules of the common law, as well as under the rules of the Spanish law, in view of more than a century's possession and continuous assertion of title under claim of right such as the originals of these copies would evidence if offered in evidence.

If these copies were improperly received, this would not lead to a reversal, if under other evidence, properly admitted, no other judgment than that entered could have been legally rendered.

During the trial, defendants offered in evidence a certified copy from the General Land Office of the copy filed in that office, under legislative authorization, of the proceedings had in the year A. D. 1767 in founding the town of Laredo, fixing its jurisdiction, granting to it lands for public uses, and to its inhabitants lands to be held in private ownership, which were described in the opinion in Railway v. Jarvis, 69 Texas, 527.

Like proceedings, occurring about the same time, at Guerrero were also shown from a similar copy, taken from the General Land Office, in the case of Downing v. Diaz, 80 Texas, 436.

In both these cases it was held, that such copies from the General Land Office were admissible in all cases in which relevant, and it is not necessary now to restate the grounds on which these rulings were based.

The only inquiry that now arises is, was the evidence relevant?

The lands claimed by defendants to be covered by the two grants are bounded on the north, at this time, by the lands set apart to the town of Laredo and its inhabitants, and on the south by lands granted to the town of Guerrero and its inhabitants on this side of the Rio Grande; and in so far as the proceedings relating to either of these towns and their inhabitants may tend to show a recognition by the Spanish government of the right of Jose Basquez Borrego, at that early day, or to show the boundaries of his claim, they can not be deemed irrelevant, and may be of the greatest importance in a case in which parties rely upon the presumption of grants resting upon long possession and other circumstances.

In such a case, proof of assertion of title more than a century ago, with its continuance, would be a potent fact, but its potency is much increased when it is shown that at so remote a period the claim was recognized by the officers of the government having power to grant lands, and charged with the duty of protecting the interest of the sovereign.

In 1767, when the royal commission reached Laredo, for the purpose of establishing towns and granting lands, it became necessary to ascertain whether there was sufficient unappropriated land in body and on the river to satisfy the wants of its inhabitants; an inquiry was made upon that subject, and in the proceedings it is stated, that Don Jose Basquez Borrego presented grants " which as it appears contains seventy-five sitios of land, fifty sitios of which are for small stock and the remaining twenty-five sitios for large stock, granted on different occasions by Colonel Don Jose de Escandon." It is then stated that some confusion in the manner of applying the grants existed, and that the consent of the supreme government to the grant of twenty-five sitios only appeared; but that as " the original permit for the said settlement was so conditioned that if his majesty should need part or the whole of said lands for founding any town or mission, he might take them; and inasmuch as the common welfare of the people should prevail over the private welfare of this estate or those estates, we do assign, in compliance with the petition of those inhabitants, considering the aridity of the country, six leagues around the town from its center in every direction, without excepting the lands *occupied* by said Borrego, whom we will hear; and upon showing his lawful right, he shall receive compensation for the portion adjudicated to the individuals of this place, and taken from his *boundaries* and incorporated in the six leagues tract; and that a testimonio of the documents above mentioned

shall be transcribed and placed at the head of the proceedings for perpetuation at all times.''

Here we have a broad declaration, that in 1767 Jose Basquez Borrego presented two grants for land to the commission, which were made by Don Jose de Escadon; that one of these grants was for fifty sitios of land for small stock, and the other for twenty-five sitios for large stock; that the latter had the approval of the supreme government; that Jose Basquez Borrego then occupied the land, but that because the right to expropriate so much of the land covered by the grants as might be necessary '' for founding any town or mission '' existed under the grants, a part of the land covered by them would be taken in order to furnish the quantum of land deemed necessary for the town and its inhabitants.

Such evidence was not irrelevant, but bears potently on the question of the existence of grants at that early day to Borrego, the fact that he then occupied the lands, and upon the question of boundary.

The proceedings show the boundary of the land granted to the town of Laredo and its inhabitants, which is the point now claimed by defendants as the point on the river where the north line of the lands not expropriated begins.

A witness placed on the stand by plaintiff, who was born, raised, and had spent a long life at Laredo, does not make the matter clearer in this respect than do the proceedings offered in evidence, when he states: '' I know the lower corner of the Laredo jurisdiction; it is on the bank of the Rio Grande below old Dolores; the old Dolores house is about one-half of a mile above the lower corner of the Laredo jurisdiction. My grandfather showed me this corner when I was a boy. It is a large stone, which was still there the last time I was there. The Borrego lands extend to or near where Laredo now is, and some of it was taken away for the town tract, and Borrego was given lands further back.''

Some persons at Laredo desiring to acquire some of the land claimed by Borrego, applied to the city authorities to have it adjudged to be vacant land; and in pursuance of this, on August 10, 1828, the authorities cited the heir of Borrego, then in possession, to exhibit the evidences of his right.

In reply to this the heir stated, that he was not in possession of the evidences of the grants to Borrego, and that their existence was doubtful, because in the year 1811 the heirs then in possession were captured by a royalist party and taken to Chihuahua as prisoners with the patriot Hidalgo; that their papers were all seized, and the houses searched for correspondence between them and the revolutionists and left in possession of royalist soldiers, since which time he had been unable to find the papers.

He, however, made known to the authorities that there was evidence of the right of Borrego in the archives of the town of Laredo, in the paper

known as the "general visita," which he asked the authorities to certify; and this was done.

The paper thus furnished, together with other evidence, including a letter from Jose de Escandon, was presented to the governor of the State, with prayer for recognition of the validity of the grants to Borrego. A translation of the letter from Escandon is as follows:

"*Jose Basquez Borrego:*  On the 2d of March last past I wrote to you with your muleteers, and passing now the leaves that your son tells me he remits to bring some mules that he left in Dolores, these few lines do not omit my respects, being anxious to know of your health and the news in your locality. On the Saturday before Easter Sunday the schooner Capitan left this port for Vera Cruz. It is thought it will be here in May. There is no particular news; everything is all right, etc. The testimonio of Dolores is still being taken out, that it may be surveyed; and it has not been finished already, because as there is only one notary he can not supply the wants. Inform me to whom do you think the survey should be intrusted. I remain as ever for all that may please you, praying our Lord that he may preserve your life many years. Santander, and April 13, 1755. Your most affectionate friend and servant kisses your hands.
"JOSE DE ESCANDON."

The petition to the governor set out elaborately the origin of the rights of Borrego, his long possession, and its manner, together with the hardships endured in warfare with the Indians; and this was accompanied with the communication of the authorities at Laredo to him, his reply thereto, the copy of a part of the proceedings in the founding of the town of Laredo, then an archive in that town, the letter of Escandon to Borrego, and the testimony of witness taken as follows:

On August 19, 1828, the heir of Borrego asked the proper authorities at Laredo to state whether or not a part of the grants made to Borrego, known as hacienda of Dolores, was not taken to give to the town of Laredo the area given to that town and its inhabitants; if this did not appear from the archives of the town made at its foundation; if the hacienda of Dolores was not settled and maintained by Jose Basquez Borrego, and after his death by his heirs; if the lands were not partitioned between the heirs of Borrego in the year 1792, and after that time occupied by one of the heirs, with large numbers of stock of many kinds; if in the year 1813 the Indians did not attack the hacienda and make it necessary for the heir occupant to build a stone tower for the preservation of the settlement; if that heir was not the alcalde of the town of Laredo in that year, and if during that year the hacienda was not again attacked by the Indians while he with his family and servants lived there; if he was not then furnished an escort by an officer named to enable him to remove his

family to a place of safety for a time, and if the Indians did not then, drive off much of his stock, kill one of his servants and his eldest son, who had charge of the hacienda; if the hacienda was not, at the time this statement was requested, in the possession of the heir of Borrego, and persons holding under him.

To this application the authorities of the town of Laredo replied, that they lacked knowledge as to some of the matters about which they were requested to make a statement, and they requested that the petitioner bring before them "two competent residents of well known good character, who will testify positively about the contents of the said petition, and as to the quantity of land that he says was taken from the hacienda of Dolores to complete those adjudged to this city, and that should appear on the archives of this tribunal, an examination will be made and a copy taken out of what may be found."

The applicant then brought two witnesses, named, who were by the tribunal declared to be "both known as men of good character and honest citizens of this city, whom I certify I know, and having read to them the foregoing petition as seen literally, they having understood well its contents, both and each for himself said, that all the petitioner states in his petition is true and certain, not only because they know it, having seen it, but it being also the common report and fame; wherefore, having seen the denunciation of lands in this city on the eighth page of the general visita, the expert Pedro de los Santos says that they could not get to the six leagues that were assigned as a limit; before they did so they trenched on different jurisdictions; and knowing from several declarations that the denunciation was completed with the six leagues, it is not known what quantity of land was taken from the hacienda of Dolores; and in the same manuscript book of the general visita is likewise found a proceeding, dated the 23d of February, one thousand seven hundred and seventy-eight years, by the lieutenant and chief justice of that year, the citizen Bartolomo Martinez, who was commissioned by the primitive tribunal of lands for the inspection of public land that may be in this jurisdiction, which judge says the survey will begin between the line of the hacienda of Our Lady of Dolores of the heirs of Don Jose Basquez Borrego, granted by his majesty to said hacienda; all of which I sign," etc.

The testimony of another witness was taken in the same year, which showed that during the necessary absence of the heir from the hacienda in the years 1818, 1819, and 1820, he had the possession maintained by another of the heirs; that possession was kept up even during the years when the Indian warfare was most severe, and down to the time this evidence was taken.

The judge before whom this evidence was taken certified that the same facts were well known to himself and to all the inhabitants of Laredo. At

the same time the testimony of other witnesses was taken in writing, and each of them testified with great particularity as to the claim, possession, and right of Jose Basquez Borrego and his heirs; of the partition of the lands of Borrego; of the difficulties attending the maintenance of possession during the Indian invasions of former years. One of the witnesses was the son of a person who was an overseer at one of the haciendas on the Borrego lands; another was a very old man, and testified as to the boundaries of the lands, as did another; and all testified to the continuous assertion of claim by Borrego and his heirs, and to the possession.

All the evidence referred to was taken at great length, and evidently that it might be used before the governor and the council; and after it was all reduced to writing, the following certificates were appended after the ordinary certificates of authentication:

" Let a copy hereof be taken out, as it is ordered by the government in its decree on page 3 of this proceeding. I, the citizen Jose Maria Gonzales, constitutional alcalde of this town, so decreed, ordered, and signed, with assisting witnesses, with whom I act in default of a lawfull-constituted notary, which there is not, which I certify.

        "Jose Maria Gonzales.

        " Tomas Flores, Assisting.

        " Faustino Ramirez, Assisting.

\*   \*   \*   " There remaining a copy of this proceeding in this tribunal, the original is sent to the government on thirty-one useful pages, without the title pages and those in blank; and in the authentication thereof, I sign it with my assisting witnesses as above set forth, which I certify." (Here signed by same officer with same assisting witnesses.)

There is another certificate, properly attested, showing that it " accords with the original that is sent to the supreme government of the State, \*   \*   \*   in compliance with the decree of the government, that this testimonio may remain in the archives of this tribunal, over which I am in charge," etc.

This collection of evidence, of the contents of which only a brief statement is here given, with the several petitions and interrogatories on which it was taken, as well as the petition to the government for recognition of the Borrego grants, all in writing, is termed a " book."

Upon the presentation of the petition of the heir to the governor, the matter was referred by him to the " government council," which, upon examining the application and evidence, made the following recommendation to the governor:

" *Most Excellent Sir:* Having informed themselves of the present petition, are of opinion that if it seems proper to the government it can order the tribunal of Laredo and Guerrero to hold the aforesaid lands to be the property of the heirs of the deceased D. Jose Basquez Borrego, not only because of the term of sixty-one years that they have been held in

quiet and peaceable possession, but also on account of the documents that accompany it; and that the titles that were lost, owing to the surprise and seizure of D. Macario Borrego (an heir of Jose Basquez Borrego) when the first heroes of liberty were taken out to Chihuahua, may be replaced, it would be proper, in the judgment of the council, that the government should order a proceeding to be instituted that should not only certify the loss of the principal documents, but adding thereto all the incontrovertible proof that can be obtained, his property be identified so that in future times they may not be thought to be vacant lands, as many individuals of Guerrero and Laredo have believed them to be.    Victoria City, December 13, 1828, 50, etc.

" MATIAS GEULLEN, Vice-Secretary.

" Victoria City, December 13, 1828."

Then follows the decree of the governor, as follows:

" In accordance with the foregoing article of the council, let the proceeding be returned to the party, that making this resolution known to the alcaldes of Guerrero City and Laredo, they may know and give it compliance.

" FERNANDEZ ELMO DE BARGAS."

These orders were received at Guerrero on December 29, 1828, and the officials of that city recognized them as the decision of the council and government, and so held them for fulfillment.

They were in possession of the authorities at Laredo on January 3, 1829, as appears from the following entry made of that date:   " Let a copy of the foregoing judgment and decree of the government, to which will be furnished in discharge of the obligation of this tribunal the information from which it believes the ownership which the heirs of the hacienda of Dolores claim to have, to be greatly mistaken, and that being better informed it proceed as it may deem just."

The authorities at Laredo not giving effect to the decrees before referred to, the heirs of Borrego, on March 12, 1829, made that fact known to the governor of the State, and invoked further action on the part of the government.

The matter was again referred by the governor to the government council on March 13, 1829, and that body reported to the governor on the 20th of the same month as follows:   " Having had under discussion the petition of the citizen Jose Maria Margil Vidauri (an heir of Borrego) touching the lands of the hacienda of Dolores, jurisdiction of the town of Laredo, that many citizens report as vacant, the council having attentively considered the contents of the petition, and having seen the depositions of witnesses taken at San Vienti de Abasolo and San Buena Ventura, belonging to the State of Coahuila and Texas, the government decided to say, that it is very probable that during the epoch of the revolution the documents of acquisition may have been lost from their respective

archives, the same fate befalling the testimonios of them; that it is to be believed that they were lost when the house of Borrego was assaulted and surprised and he taken prisoner to Coahuila and Texas at the time that the first heroes of liberty were taken; and although in the judgment of the council, it is true that these events caused the loss of the documents of acquisition of which the petition speaks, it appears from it that the loss of said documents of acquisition is replaced by the declarations which appear in the depositions that are now presented, which leave no doubt that the lands referred to belong to the heirs of Don Jose Basquez Borrego, whose successors have in their favor not only the evidence of competent witnesses that they have presented, but the uninterrupted term of sixty-one years that they have possessed the lands without intermission, as is proved by eye-witnesses that they present, being (in the judgment of the justices that have taken the depositions) competent, and for this reason worthy of faith and credit, which truth is apparent not only from the letter written in Santander (to-day town of Hermes) by the Count of Escandon, the thirteenth day of April, one thousand seven hundred and fifty-five, to Don Jose Basquez Borrego, but also by the copies of the proceedings of the general visita that exists in the constitutional archives of Laredo. From all of which it follows that the aforementioned lands in dispute belong to the heirs of the said Don Jose Basquez Borrego, and for these reasons the council says to the government, that in its judgment the proofs that are offered as the best to prove the legitimate right that the heirs of Borrego have, and to prevent in future times the suits that might originate for the want of the primitive documents, it will be expedient in the opinion of the council for your excellency to order that a manuscript book be made of this petition and documents, and these originals remain in their respective archives, the interested parties taking out the testimonios they may need to prove their rights.''

This report of the council was properly authenticated and presented to the governor, who, on March 23, 1829, thereon made the following decree: ''Accordingly this petition is returned to the party, in thirty useful pages, that, presenting it to the alcalde of the town of Laredo, he may give to those interested the testimonios that they may ask for, and which will serve them as titles of property, and taking out a copy which will remain in that tribunal, he forward the same petition to this government to file it. FERNANDEZ.''

The petition last referred to, the report of the council thereon after having examined the evidence presented, the decree of the governor, and the evidence offered in support of the petition, together constitute what in the proceedings is called '' Manuscript Book First.''

The evidence, so far as it consisted of the testimony of witnesses, was taken upon written interrogatories, and that the character of the testimony of the witnesses contained in that '' book'' may be understood,

that of one of the witnesses, other than the part which goes to his competency, was as follows: "He said that he knew Don Fernando Borrego and Dona Manuella, of the same surname. He likewise knew that they held as legitimate property the hacienda of Encimos, the first by purchase which he had made from his father, D. Jose Borrego, and that of the Alamo, which on equal terms was enjoyed by Dona Manuella Borrego during the lifetime of her husband, Don Juan Antonio Vidauri, to whom his father-in-law had sold and conveyed it. That he learned that the aforesaid Jose Borrego had been the settler of said lands, and that in the year fifty, having them already sold to his children, he went with his people and property to the State of Tamaulipas, formerly called the province of Santander, where he knows positively that he denounced the lands now occupied by the farms of Dolores, Corralitos, and San Ygnacio (the lands in controversy); that deponent being an intimate friend of the Messrs. Borrego, they several times showed him the titles and papers, and among them he saw and read those appertaining to the three haciendas that he has already mentioned. That he has heard his ancestors say many times that there had not been any other settler of the lands which the farms of Dolores, Corralitos, and San Ygnacio occupy than the said D. Jose Basquez Borrego; that he was the settler of those lands, as well as of those others, before the town of Laredo and the city of Guerrero were founded.

"That the possessions he has mentioned are the ones he knew as the property of those gentlemen; that he knew them inhabited by large numbers of stock; that if they had other property he is not aware of it; that he has stated how he saw the titles of those they enjoyed in the State of Tamaulipas; that about the loss of papers, as he lived near the Alamo, he heard and at the news went and saw, that about the year ten or eleven, Messrs. Borrego, D. Macasio, and D. Miguel, were surprised at midnight by an officer of the royalist party, who with ten men took them prisoners and searched their house, seeking for the correspondence they supposed had with the liberal party; that the gentlemen were conveyed as criminals of importance as far as the headquarters of Chihuahua, leaving the house, jewels, and papers in charge of an overseer; that after the lapse of seven months the Borregos returned, already free, and they complained of the loss of the principal papers, saying to deponent, that it would cost them a great deal of money to replace them again, because they had been the most important, but that he never knew which ones they had been; that about the division and partition he knew was made among the heirs of the estate of Don Jose Basquez Borrego, he knows that the farm of Dolores was awarded to Dona Manuella." This witness was eighty years old at the time his testimony was taken.

The testimony of all these witnesses, with the proceedings through which

it was obtained, was styled "Second Book," while the proceedings first referred to were styled "Third Book."

The proceedings and decrees, as well as the evidence on which the decrees were based, in accordance with the decrees, were filed in the archives at the town of Laredo, a copy there made and retained, where was taken a certified copy that was used on the trial of this cause.

The original copy of the papers filed in that archive, under the direction of the governor, was in existence at the time of the trial, and was also offered in evidence, proof of the genuineness of the signatures of the officers living made and in no manner controverted.

The foregoing condensed statement of what appears in the paper offered in evidence as an archive of the city of Laredo is given not only with a view to the inquiry whether it was admissible, but in view of the further inquiry as to the weight that should be given to it, in determining whether the grants were made to Borrego as claimed, if it be held admissible.

We will not undertake to discuss the numerous objections made to the admission of the evidence now under consideration, but will briefly state the grounds on which we hold that it was properly admitted.

Under the evidence the genuiness of the papers found in the archives at Laredo ought not and seems not to be questioned. This being true, it must be presumed that they became archives at the time they appear so to have become, which was in the year 1829.

The inception of the inquiry which the papers evidence began, as was then proper, in an inquiry by the authorities of the town of Laredo whether the lands in controversy were vacant, and therefore subject to appropriation by persons who doubtless caused the inquiry to be instituted.

That question was carried before the governor of the State, who had power not only to inquire whether they were vacant, but if found so to be, to grant them to any proper person.

That officer referred the matter, with the evidence on which the claim of the heirs of Borrego was then sought to be sustained, to the government council, and on the report of that body he determined and decreed that the lands were granted to Borrego, and as evidence of their right the government required that all the proceedings, consisting of the several petitions, decrees, and all the evidence offered in support of the right, should become archives at Guerrero and Laredo, from which the parties interested should have copies, which "will serve them as titles of property."

That the paper archived at Laredo may have been a copy of the original papers, is a matter of no consequence in this case, for it is just what the authorities of that day deemed necessary and proper there to place as the evidence of right, and at this day it will be conclusively presumed that they acted in accordance with the laws then in force.

The archive at Laredo was evidence of right when and under the circumstances that gave it existence, and the lapse of fifty-eight years since

that time, continuous possession and assertion of claim under the grants,. the existence of which the government recognized, has but added to the probative force of the archive.

The proceedings are not to be compared to those between private persons, for they involved the action of the government itself in regard to a. matter in which it was interested, over which it had power to make inquiry, and to determine whether the land was vacant or owned, as claimed, by the heirs of Borrego.

The highest authorities in the state acted, made decrees and directed that they should be archived at Laredo for the very purpose for which copies from the archive and the archive itself were used in this case, and it can not be presumed that those officials exceeded their powers.

The authenticity of the archive at Laredo is placed beyond question, and having been made under the circumstances shown, ought to be received in evidence, not only to show what the action of the government was, but also to show on what evidence the report of the government council and decrees of the governor were made.

That evidence was placed in authentic form, in a proceeding to which the State of Tamaulipas and the heirs of Borrego were in effect parties. This was done in a proceeding in its nature judicial; and as against appellant, who asserts rights through the state, who has succeeded to all the rights held by the State of Tamaulipas, the Republic of Mexico, or the Spanish Government, this evidence ought to be received to prove facts. from which grants to Borrego may be presumed and their boundaries determined.

During the trial appellees offered in evidence a paper in the Spanish language, of which the following is a translation:

"In the town of New Santander, on the second day of the month of August, one thousand seven hundred and fifty-seven, I, Joseph de Escandon, Governor of the Colony of New Santander, acting as judge ex officio (receptor), there being no notary in terms of the law, having been requested by Don Joseph Basquez Borrego to order a survey, designation of the boundaries, and the placing of monuments of the fifty leagues (sitios) of land for small stock and twenty-five for large stock, a grant of which has been made to him, of which a testimonio to answer as title was sent to him yesterday, and for this purpose to commission the officer at my pleasure, being proper as it is that it should be so done, I said that I had to order and I do order that Don Joseph de Chapa, captain of the town of Mier, after that this has been presented to him on the part of the said Captain Don Jose Basquez Borrego, shall go to the settlement of Dolores and survey and designate the boundaries and place the monuments of the mentioned fifty leagues (sitios) for small stock and twenty-five for large, in conformity with the said title and decree, on twenty leaves, in which it. is commanded that from the houses of said settlement which shall be in;

the center, seven leagues shall be measured down the Rio del Norte, and when they shall end, in seven small hills as it is supposed, he shall place a monument, which shall be the boundary to be observed with the town of Revilla, and seven more leagues from said houses up the river, and where they end he shall place another monument, which shall divide the lands of said captain from those of the settlement of Laredo, whose settlers he shall cite to be present at said survey, as well as the captain and settlers of the mentioned town of Revilla, about that which pertains to the side which concerns them; and upon the said fourteen leagues measured on the bank of said river, he shall follow with the survey of the other (leagues) on the east and northeast until completing the number contained in said grant, setting down the proceedings with the greatest clearness; and the same being concluded, that he make report to me with the originals, so that in view thereof I may direct what is proper.    Thus I order and signed with my assisting witnesses, which I certify.

" JOSEPH DE ESCANDON.

" De asistencia:   MELCHOR DE NORIEGA.

" ANTONIO VICENTE MORALES.

" This testimonio agrees with the decree, which original (decree) remains in the archives of the proceedings of the foundation of the settlement of Dolores, whence I caused it to be taken, so that its contents may be known to the Captain Don Joseph Florencio de Chapa; it is correct and true, having been corrected and copied in these two leaves of common paper, as witnesses of the transcribing, correcting, and comparing it there were Antonio Altamirano, Joseph de Arzila, and Don Jose Caballera, citizens of the same town of New Santander, where it is dated on the fourth day of the month of August, one thousand seven hundred and fifty-seven, and I signed it, with those of my assistants, which I certify.

"JOSEPH D. ESCANDON.

"Assisting:   MELCHOR DE NORIEGA,

"ANTONIO VICENTE MORALES."

It was objected to because irrelevant, but under the facts of the case we can not suppose the objection to have been seriously made.

It was objected to on the ground that it was a copy of a copy in the third degree, but the paper purports to be the original or testimonio taken directly from the protocol by the officer who executed and was the custodian of that, and after the lapse of more than a century would be admissible without proof of its execution, coming from proper custody and free from suspicion, as evidence of a step toward title and identification of the land; and especially so when offered in connection with evidence tending to show the loss or destruction of the original titles and the archived protocols as well as the possession and claim to the land held and asserted for so long a time.

It is claimed that neither the paper offered nor its protocol was authorized by law; but it ought not to be claimed that a person clothed with such powers as Jose de Escandon had to grant lands had not lawful power to direct them to be surveyed, to appoint a surveyor, and to give him full instructions as to what land should be embraced in the survey.

It was objected to on the ground, that "it appears therefrom that no survey was ever made by virtue of it or of its original, to attach it or such original to any particular tract of land, or to separate any land whatever from the public domain, and that it does not describe or embrace the premises in dispute in this action, and that no such final action of the government as is contemplated by its terms was ever had thereon, and that it was never returned to or made any part of the protocol in the charge of the officer purporting to have issued it, and that if genuine it is a mere unexecuted order of a governor of a former government, and void for want of being carried into execution, as well as for want of certainty."

There certainly is nothing in the paper to show that the person ordered by it to make the survey did not comply with the command to the letter, and if the evidence offered in the case be true, there can be no doubt that the land covered by plaintiff's locations are within the boundaries that would have been defined by a survey made in pursuance of the order; nor does it in any manner tend to show that no final action was ever taken, nor that a survey was not made in obedience to it.

It seems to be contended that the fact that it was not returned to the officer who issued it evidences the fact that it was never executed, and that it was necessary it should have been returned, but we see nothing to sustain such a view.

The officer who issued it did not need it, for he had its protocol; it shows upon its face that it was sent to Don Jose Basquez Borrego, for it commands the person named, "after that this has been presented to him on the part of said Captain Don Jose Basquez Borrego," to go to the settlement of Dolores and make the survey as directed, and "the same being concluded, that he make report to me with the originals, so that in view thereof I may direct what is proper."

If the original titles were presented with no more certain description of the land granted than that found in the order to survey, no court would be justified in holding that the grants were void for want of sufficient description of the lands granted; and if the lands were not in fact surveyed, this would not invalidate the grants if sufficiently described in the titles.

As the paper purports to have been sent to Borrego, and was not required to be returned with the surveys, which were doubtless the originals referred to, it can not be held that it did not come from the proper

custody when offered by the heirs of Berrego or by persons holding under them.

That the paper did not within itself show title was no reason for excluding it, if it did show any fact rendering it probable that grants were made, or if it tended to show how the boundaries of the grants were to be.

Conceding the paper to be genuine, in the absence of the titles it became very important in many respects, although, as would appear from it, it may not have been intended that the surveys should be incorporated into the titles, for it declares that "a testimonio to answer as title was sent to him yesterday" for the seventy-five sitios of land; it declares how many sitios of each class, and furnishes the means by which their boundaries may be accurately ascertained.

The inference is that the purpose of the survey was not to furnish a sufficiently accurate description of the land to be incorporated in the titles, but to establish monuments whereby all persons interested might know where the boundaries called for in the titles run.

It is objected that the instrument was not written on stamped or sealed paper, and that for this reason the paper should have been excluded.

On its face it purported to be on *common paper*, and instruments written on such paper were not void.    After this lapse of time it will be presumed that the facts existed which authorized the very distinguished and upright officer whose act it purports to be to use such paper.

The lands claimed to be included in the grant to Borrego were surveyed during the latter part of the year 1874 and the early part of the year 1875, and the field notes then made out were corrected in December, 1879. This was done by the surveyor of the county in which the lands are, and the field notes were returned to the General Land Office.    On the trial of this cause copies of the field notes, certified from the General Land Office, were read in evidence.

Unless the survey was made under some lawful authority, we see no valid ground on which the evidence was admissible, for the Commissioner of the General Land Office would not be authorized to file in his office a mere private survey, and therefrom give certified copies which, under the statute, would be admissible in evidence; but the admission of such evidence in this case could not have affected its decision, for it could have no bearing on the question whether grants were made to Borrego as claimed, and the boundaries claimed to have been covered by these grants was otherwise shown.    If the admission of the evidence was erroneous, as the cause was tried by the court and its admission could not have affected the findings of fact, this would be no ground for reversing the judgment.

Field notes of another survey of a part of the lands claimed to have been granted to Borrego, made in 1859, were also offered in evidence, and we are of opinion that they ought to have been excluded, for no law-

ful authority for making the survey was shown; but their admission could not have affected the case one way or the other.

Several patents, the field notes of which call for the Jose Basquez Borrego grant, were read in evidence, and it is urged that this was error. Such evidence could have very little bearing on any question involved in this case, but we are not prepared to say that it was irrelevant.

Many instruments, all of which bore date prior to the year 1833, and showing transactions between the heirs of Jose Basquez Borrego, and between some of them and other persons, in relation to the lands claimed to have been granted to them, were read in evidence.   These purported to be originals taken from the protocols mainly, but some of them may have been second copies taken from protocols by the notaries having them in custody, and it was urged that it was improper to admit them without proof of their execution.   They were admitted solely to show claims of right by the heirs to the land claimed to have been granted to Borrego and the exercise of the rights of ownership over it, and after the lapse of so many years, under all the circumstances, were admissible.

A copy of the paper known as the "general visita," evidencing the proceedings had in founding the town of Laredo and granting lands to the town and its inhabitants, certified from the General Land Office, was read in evidence, showing that in the year 1767, when these proceedings were had, Jose Basquez Borrego presented his title to the fifty sitios of land for small stock and twenty-five sitios for large stock to the authorities charged with the duty of founding the Rio Grande towns and granting lands to them and their inhabitants, and tending to show that a part of the grant to Borrego was then taken from him in order to give to the town of Laredo sufficient area, as was provided in the grant to Borrego might be done on making compensation to him.

That such evidence was admissible was held in Railway v. Jarvis, 69 Texas, 527, and Downing v. Diaz, 80 Texas, 436.

Its relevancy has already been considered.

Some witnesses interrogated as to the boundaries of the grants claimed to have been made to Borrego, did not profess to have knowledge of the boundaries claimed before the year 1853, and some of them, in addition to stating what had been the recognized corners from that time, made statements as to what their ancestry had given to them before that time, and this seems to have reached common repute.

The evidence was objected to on the ground that it was irrelevant, and on the further ground that it contradicted the averments of defendants' pleadings.   The evidence was not irrelevant, and we do not see in what respect it was in opposition to their pleadings.

These witnesses did state that a large number of persons lived on different parts of the lands claimed to be covered by the grants, and that they had so lived, some of them, within their knowledge, since about the

year 1830, and it seems to be contended that evidence that persons so lived, claiming under the grant, was not admissible, unless they lived on the identical land appellant sought to appropriate.

If they lived on any part of the grant, and claimed under it, the evidence was admissible.

Having disposed of all the material questions raised by appellant on the admission of evidence, we make the inquiry, whether the findings of material facts by the court below are so sustained by evidence as to justify them; and the further inquiry, whether, notwithstanding some evidence may have been improperly received, any other findings on the material issues than those made could legally have been made on the evidence properly received.

There are twenty-three assignments of error, in which appellant questions the correctness of the findings of the court below, and in which he insists that different findings should have been made; but we will not undertake to discuss them severally, and will confine our inquiry to the sufficiency of the evidence to require the material findings made.

The court found that grant was made to Jose Basquez Borrego as early as the year 1757, and that in the year 1829 the grant was confirmed by the State of Tamaulipas. It was also found that the boundaries of the grants were fixed, and that the lands appellant sought to appropriate were within these boundaries.

Those findings, if supported, are conclusive of the rights of the parties.

Were the grants made to Borrego? We know from history that Jose de Escandon from the year 1734 to sometime after the year 1757 had command, both civil and military, in that region bordering on the Gulf of Mexico, and extending from the Rio Panuco to the boundary of Texas and westward so far as to embrace territory in some of the Mexican states besides Tamaulipas.

From the same source we also know, that in the year 1746 he was required to undertake the pacification of the natives within the territory subsequently embraced within the State of Tamaulipas, and to bring about the settlement of the country on the Rio Grande and eastward to the Rio Nueces, and that such pacification of the entire country under his command was accomplished, and such settlement of the Rio Grande country secured, through his efforts and personal sacrifices for the public good, as secured to him not only the esteem of his contemporaries, but a name and honored memory, cherished even until the present time by the people of Tamaulipas.

This is the man from whom it is claimed Jose Basquez Borrego obtained grants to the land in controversy, and if he issued titles which may have required confirmation, this would be presumed from the long continued occupation of the land by Borrego and his heirs in any court, whether controlled by the rules of the common law or the rules of Spanish law.

That Borrego exhibited to the subdelegation that founded the town of Laredo, in 1767, titles executed by Escandon, can not be denied, for this is shown to have occurred on the face of the proceedings of the subdelegation.

The reason for the declaration is shown. Borrego was then declared to be in possession; a part of his land was taken for the inhabitants of the town of Laredo, and the boundary between his lands and those of the town and its inhabitants was fixed at that time, at the " Canada de San Andris," and the papers by which these things are shown were recognized as genuine and entitled to full faith by the governor and council at Tamaulipas in March, 1829.

Confirmatory of this evidence we have the letter of Escandon to Borrego, of date April 13, 1755, in which it was stated that the title " testimonio of Dolores is still being taken out that it may be surveyed, and it has not been finished already, because, as there is only one notary, he can not supply the wants."

Was this letter spurious? It would be difficult to believe that, in 1828, the heir of Borrego would have presented to the governor of the state a letter purporting to be signed by a person so well known as was Escandon if it was not genuine; but to place that matter beyond question both the governor and the council acted upon it, gave faith to it, and placed the seal of genuineness upon it when they directed it to be archived as a part of the evidence on which the claim of the heirs of Borrego was declared to be valid.

The order of Escandon appointing a surveyor, and bearing date August 2, 1757, declares that on the preceding day a " testimonio to answer as title was sent" to Borrego.

This evidence, as before held, was all admissible, and it establishes the fact that Escandon did issue to Borrego written muniments of title.

As before seen, there was evidence tending to show that these evidences of right were lost or destroyed in the year 1811, and this, in effect, was the finding of the government council in 1828 and 1829.

In fact, the council went further, and held it "*probable that during the epoch of revolution the documents of acquisition may have been lost from their respective archives, the same fate befalling the testimonios,*" and these facts directed to be certified.

So much evidence is in existence showing that titles to Borrego at one time actually existed; but if there was no such evidence, how would the matter stand?

The evidence presented to the governor and council shows, with all reasonable certainty, that the land was claimed and occupied by Borrego and his heirs from about the year 1750 until 1828, when that matter was investigated by the governor and council. The declaration of the council on March 23, 1829, was that the evidence of competent witnesses

showed that they had then had an "uninterrupted term of sixty-one years that they have possessed the land without intermission, as is proved by eye-witnesses that they present." The same fact was asserted by the council on December 13, 1828, and we accept this now, as it was then, as true.

The evidence of witnesses who testified in this case shows, with all reasonable certainty, a continuous occupation of the lands since the year 1829 by the heirs of Borrego and persons claiming under them, asserting right under grants to Borrego, and there is nothing tending to show that their right was ever questioned from the time the governor and council declared its validity until the locations relied on in this case were made.

What was the character of the possession? The original settlement is shown to have been made at the hacienda or town of Dolores, but since that time the villages of Coralitos, San Ygnacio, and another also known as Dolores, have been built, and in these towns or villages, and on other parts of the lands, have dwelt hundreds of people claiming under Borrego.

Such a possession, so long continued under claim of right, was of itself sufficient to require a finding that a grant or grants were made to Borrego,. and had the finding been to the contrary it should be set aside.

The court found that the title to Borrego was confirmed by the State of Tamaulipas in 1829, and while this may not be technically correct, the action of the governor and council before referred to, under all the facts, ought to be held, in effect, an adjudication that a valid grant or grants were made to Borrego which did not need the state's confirmation.

Were the boundaries of the lands granted to Borrego fixed with such certainty as to give validity to the grant or grants?

The order of survey issued by Escandon describes, with all necessary certainty, the lands included within the grant, a testimonio of which it declared issued and was sent to Borrego on the day before the order of survey issued; and, as before said, a survey was not necessary to the validity of the grant if, without it, the land could be and was sufficiently described. The survey was to be made "in conformity with the said title and decree on twenty leaves," and what would be in conformity with the title was expressly stated.

That paper shows, that even at that date Escandon had determined to found the towns of Laredo and Revilla, but this did not actually occur until 1767, though settlements were made at those towns evidently before the order of survey issued. The order shows that the lands granted to Borrego were to be between those to be granted on the south to the town and inhabitants of Revilla, and to the town and inhabitants of Laredo on the north, and to embrace a front of fourteen leagues on the river, the houses then existing to be the central point from which seven leagues each way were to be measured, and on this front, running back, the quantity of land called for was to be given.

The evidence tends to show that the survey was thus made, but that some years afterwards, when the subdelegation actually established the town of Laredo, it was found necessary to take from Borrego some of the lands granted to him, in order to give to the inhabitants of the town of Laredo the quantity of land deemed necessary by the subdelegation, and this may have resulted from the growth of population at Laredo between the time the grant was made to Borrego and the time when the lands were actually set apart by the government for that town and its inhabitants.    We are, however, fully advised of the point made the dividing line between the lands of Borrego and those pertaining to the town and its inhabitants.

That was the point known as "Canada de San Andris," from which the line ran eastward with line of the most southern portion laid off for the inhabitants of the town.

We further know from the evidence, that what is now known as "Dolores Viejo," or Old Dolores, was the first settlement made by Borrego on the land, and that if the measurement south be made from where the houses then stood, those seven leagues will reach below the northern boundary of the lands granted to the inhabitants of Revilla, now known as Guerrero.

The evidence further shows, that the corners on the river have been well known and recognized as far back as the year 1812, and it is a conceded fact that the lands located by appellant are, in part at least, within the Borrego grant if this be delineated in accordance with the order of survey made in 1757.

We may say that the proof shows the lands located by appellant to be wholly within the lower half of the lands granted to Borrego, some of which, however, may have been taken for the inhabitants of Guerrero, as were lands on the upper part of the grant taken for the inhabitants of Laredo, but as to this the record does not advise us.

If so taken, they were not subject to location by appellant; if not so taken, they were not so subject to location, for they belonged to the heirs of Borrego or to persons holding under them.

That appellant had notice of the Borrego grant when he made his locations is too clear.    It was delineated on the maps of the county in the surveyor's office, on the maps in the General Land Office; and besides, had on it several villages inhabited by hundreds of people, as well as many farms and ranches, all these residents claiming under the Borrego grant.

If there was no evidence tending to show that a grant was actually made to Borrego, the possession shown to have existed for a century and a quarter under claim of right to fixed boundaries furnishes evidence on which no court ought to hesitate to presume a grant.

Several generations have been born, reared, and buried on these lands, claiming through Borrego; towns with considerable populations grown

up, and ranches in great numbers opened and used by persons claiming through him.

The Spanish government in 1767 lined the Rio Grande in that part of Tamaulipas with towns above and below these lands, and appropriated lands thereto, but the lands covered by the Borrego claim never had a government town established upon them; and when a part of the lands were needed for the inhabitants of Laredo the Spanish government claimed the right to expropriate a part of these lands, it based its right to do so on a right reserved in the grant itself.

From 1750 to 1828 the right of Borrego and those claiming through him was never questioned by the Spanish Government, the Republic of Mexico, or the State of Tamaulipas, though the possession and assertion of right was such as to have invited, if not challenged, inquiry as to the validity of the claim, if any suspicion of its invalidity existed.

In 1828 persons desiring to acquire these lands questioned the right of Borrego, which led to inquiry as to the validity of his claim by those clothed with power to make the inquiry, and this resulted in an adjudication that the land was granted to him, and this adjudication, together with the evidence on which it was based, was directed to be archived at Laredo, to evidence the loss of the original evidences of right and to prove the right, "so that in future times they may not be thought to be vacant lands, as many individuals of Guerrero and Laredo have believed them to be."

A change of government occurred; the lands became a part of Texas, but the State never questioned the right of those claiming under Borrego; and, so far as the record shows, no person prior to the time the locations in question were made sought to appropriate those lands.

Under such a state of facts, the court below, if all evidence objected to and not held to be admissible had been excluded, could not legally have made findings other than those we have considered.

It is probably true that the field notes of the survey, as collected in 1879 and filed in the General Land Office, embrace much more land than those claiming under Borrego would be entitled to, even if none of the land granted had been expropriated and given to the town of Laredo; but that has no bearing on the question before us, the land located being within the limits of the grant.

The view taken of the case will lead to an affirmance of the judgment, and it becomes unnecessary to consider the cross-assignments of error filed by appellees, which relate to the exclusion of evidence offered by them.

The judgment of the court below will be affirmed.

*Affirmed.*

Delivered June 24, 1892.