STATE OF TEXAS v. A. M. BRUNI ET AL.

Decided October 26, 1904.

**1.—Grant—Evidence.**

Evidence considered and held to support finding that land in controversy was granted by the Spanish government in 1767, though no paper grant was produced.

**2.—Possession—Deed—Recitals.**

Recitals in ancient deeds tending to show possession or other acts of ownership prior to their dates, may be considered as evidence of such facts.

Appeal from the District Court of Travis, tried below before Hon. V. L. Brooks.

*C. K. Bell,* Attorney-General, for appellant.—The sole question for the determination of this court, as I view it, is this: Can the court presume title to the land in controversy by prescription, when the proof of possession or claim of ownership does not, under any circumstances, relate to an earlier period than the year 1829? That limitation does not run against the state is well settled. This was expressly provided by the act of limitation enacted by the Republic of Texas, in 1841, but would be the law if there was no act. Paschal v. Dangerfield, 37 Texas, 305; 76 American State Reports, 489, note. Forty years' possession was necessary to create a presumption of a grant as against the king of Spain. Crespin v. United States, 168 U. S., 218; Sayles Real Estate Laws of Texas, art. 698. No limitation would run against the Republic of Mexico; that is, under the legislation of Mexico, public lands are imprescriptable. Crespin v. United States, 168 U. S., 218.

Long prior, then, to the first proven claim that the land granted to Borrego embraced within its boundary any of the land sued for in this case, the king of Spain had lost dominion over the territory in which the land is situated. No title by prescription could have been acquired and no presumption of title to the land sued for would originate as against the government from possession; but if this be not the case, the prescription from which title can be inferred must have been complete before the country in which the land is situated passed from the dominion of any other government and became a part of the Republic of Texas. This point, we understand, has been expressly decided by the Supreme Court of the United States in several cases. Hayes v. United States, 170 U. S., 637; Hayes v. United States, 175 U. S., 260.

As a matter of fact, the State of Texas has never recognized that the Borrego grant took in any of the land in controversy. The state, in 1875, began to grant titles to different parts of the land sued for, and has patented a very large portion of it; and it is not shown that the defendants, or any of them, had actual possession of the land prior to the time when the state began to patent them; and, while the defendants are shown to have been claiming the land recently, it is further shown that the state has not conceded the validity of this claim, because she has continued to grant patents and to lease the land. Paschal v. Dangerfield, 37 Texas, 305; 76 Am. St. Rep., 489, note; Crespin v. United States, 168 U. S., 218; Sayles Real Estate Laws of Texas, art. 698; Hayes v. United States, 170 U. S., 637; Hayes v. United States, 175 U. S., 260.

*E. A. Atlee,* for appellees.—There was evidence to warrant the court in finding that the Borrego grant extended out to the foothills—the Sierra or Sierrita—as the court found it did; and the documentary evidence, together with the evidence of possession under claim of title, shows a perfect right to all the land adjudged to the appellees, including the lands sued for; and, if necessary, a grant thereof will be presumed. As to presumption of a grant: Taylor v. Watkins, 26 Texas, 688;

Yancey v. Norris, 27 Texas, 40; Paschal v. Dangerfield, 37 Texas, 273; Von Rosenberg v. Haynes, 85 Texas, 357; Texas Mex. Ry. Co. v. Uribe, 85 Texas, 386; Turner v. Rogers, 38 Texas, 582; Kempner v. Victoria, 3 Texas, 159; Jones v. Borden, 5 Texas, 410; Fletcher v. Fuller, 120 U. S., 534; United States v. Chaves, 159 U. S., 452; United States v. Chavez, 175 U. S., 509; United States v. Pendell, 185 U. S., 189; 1 Gr. Ev., secs. 17, 45, 48. Recitals in ancient deeds as evidence of possession: 1 Greenleaf Ev. (16 ed.), secs. 108, 189; Boston v. Richardson, 105 Mass., 351; Dunn v. Eaton, 92 Tenn., 743. Proof of boundaries by reputation: Clark v. Hills, 67 Texas, 141.

Possession of part of tract described in deed is constructive possession to the extent of the boundaries mentioned in the deed: Fry v. Baker, 59 Texas, 404; Anderson v. Lockhart, 2 Posey U. C., 63; Cantagrel v. Von Lupin, 58 Texas, 570; Peden v. Crenshaw, 81 S. W. Rep., 369. Presumption of grant under Spanish law: 2 Sayles' Real Estate Laws, arts. 698, 707; Escriche, pp. 156, 610, 664.

Under the statute this case must be tried in accordance with the laws of nations, the laws, usages and customs of the Spanish or Mexican government, and the constitution, laws and treaties of the United States and of Texas, and in accordance with the principles of equity; and when so tried, the facts show that the plaintiff is not entitled to recover the lands sued for, because of the great lapse of time during which the plaintiff asserted no claim to said lands, and because such inaction on the part of plaintiff is unattended with circumstances that repel the presumption that plaintiff waived its rights, or that the same were settled; and because the facts show that the plaintiff is guilty of laches and neglect, and there is a lack, on the part of plaintiff, of conscience, good faith and reasonable diligence. De Cordova v. Smith, 9 Texas, 146; State v. Purcell, 16 Texas, 305; Power v. State, 41 Texas, 102; State v. Kroner, 2 Texas, 492; Walet v. Haskins, 68 Texas, 418; H. & T. C. Ry. v. Travis Co., 62 Texas, 16; Badger v. Badger, 2 Wall., 87; State v. Snyder, 66 Texas, 687; Speidel v. Henrici, 120 U. S., 377; Richards v. Mackall, 124 U. S., 183; Hammond v. Hopkins, 143 U. S., 224; Halstead v. Grinnan, 152 U. S., 412; 2 Storey, Equi. Jur., sec. 1520; 2 Pom. Equi. Jur., sec. 817-821; 1 Bates' Fed. Equi. Pro., 147, 258-260; Act of Leg., September 3, 1901.

KEY, ASSOCIATE JUSTICE.—The nature and result of this suit are stated as follows by the attorney-general in his brief: .

"This suit was brought by the appellant to recover from the appellees the title to and possession of a certain tract of land, situated in Webb County, containing about six leagues.

"The defendants claimed that the land sued for was a part of a grant made to Borrego by the king of Spain, and as the Supreme Court in the case of Von Rosenberg v. Haynes, 85 Texas, 357, had held that the evidence was sufficient to establish the validity of that grant, it was not questioned, but it was contended that the land in controversy was no part of the Borrego grant.

"The defendants filed a petition in reconvention under the Act of 1903, and asked to have the Borrego grant confirmed and the boundaries

of the same established. It was admitted that there had been made
a grant by the king of Spain to Borrego for forty-seven and one-fifth
leagues of land. It was proven that the original grant was located upon
the Rio Grande, and extended above and below the present corners of
the Borrego grant which are upon the river. It was proven that sub-
sequently a part of the upper portion and also a part of the lower portion
of the grant which had been made to Borrego was expropriated for the
purpose of founding the towns of Laredo and Guerrera, and that the
corners of the portion so expropriated were established on the banks of
the Rio Grande at points which are still recognized and well known as
the upper and lower corners on the river of what was left of the original
Borrego grant.

"It was claimed that the owners of the Borrego grant were compen-
sated for the land taken for the purpose of founding the towns of
Laredo and Guerrera by giving them land back of the unexpropriated
portion of the grant. It was agreed that a survey with the river for its
western boundary, and the northern and southern lines extending out
from the river from the recognized corners to the western boundary of
the land sued for, would contain forty-seven and one-fifth leagues of
land, but it was contended by the defendants that the new grant to
Borrego embraced the land extending out to the sierritas or foothills.

"The question, then, for the determination of the court, was as to
whether the back line of the Borrego grant stopped at the point where
it, in connection with the other lines, would inclose forty-seven and
one-fifth leagues of land, or whether it extended back to the foothills.

"The case was tried by the court without a jury, and it was found that
the eastern boundary line of the Borrego grant extended to the sierritas,
a distance of 4,601 varas farther than would be the line if it had been
located as contended for by the plaintiff.

"It was shown that the state had patented a very large part of the
lands sued for, and it was not contended that the state should recover
the land which had been so patented, but there was a considerable por-
tion of the land to which the state had never parted with her title, and
which still belonged to the state, unless it was included within the
boundaries of the Borrego grant.

"Judgment was rendered for the defendants confirming the title and
fixing the boundaries of the land as claimed by them, from which judg-
ment this appeal was taken. It was not and is not now questioned but
that the judgment was correct, so far as the confirmation of the grant
for forty-seven and one-fifth leagues of land was concerned, but the
objection was and is made that the court should have fixed the boundaries
of the land confirmed so as to include only the amount of forty-seven
and one-fifth leagues."

Counsel for appellees has made the following additional statement as
to the nature of the suit: "In addition to the statement made by ap-
pellant as to the nature and result of the suit, to clearly understand the
question involved, it is necessary to say: The admission by appellant
that forty-seven and one-fifth leagues of land were granted to Borrego
does not justify the assumption that no more land was granted to him.
The forty-seven and one-fifth leagues were granted on two occasions—

a part in 1750, and a part in 1753. The lands so granted were situated on the Rio Grande, with a frontage thereon of fourteen leagues and a depth back therefrom, for quantity, about three leagues.

"In these grants the government, by express terms, reserved to itself the right to expropriate, at some future time, if deemed necessary, for a purpose stated, a part or all of the lands so granted, and expressly stipulated that Borrego should be reimbursed with other lands for such as might be taken from him under the right so reserved.

"In the year 1767, the government, in the exercise of the right reserved as before stated, expropriated more than one-half of the land granted, leaving Borrego, of the forty-seven and one-fifth leagues originally granted, a frontage of only six leagues on the Rio Grande with a corresponding depth of about three leagues.

"Now, the question raised by the pleadings and evidence and which the judgment appealed from decided, is, what was given to Borrego as compensation or reimbursement for the lands which were taken from him?

"The plea in reconvention sets out particularly the title relied on, and the judgment is, in effect, that in the year 1767, following the expropriation of his lands, Borrego went into possession of other lands back of and adjoining the part which remained of the lands originally granted, extending his possession as far back as the Sierra, and thereafter remained in possession thereof, claiming that the Sierra was the back limit or boundary of the lands which were given to him as compensation for those which were taken from him under the reservation in the original grant; and that the evidence showed a good and valid title to all the lands so claimed, including the lands sued for; and it was specially pleaded that the possession, title and claim of defendants and those under whom they claim, is protected under the treaty of Guadalupe Hidalgo.

"It was also pleaded by appellees that title to the land within the limits and boundaries, as claimed, was confirmed to Borrego, his heirs and assigns, by a judgment of the District Court of Webb County, in 1871, in a suit properly brought under the Act of 1860; and that such judgment was within the provisions of the remedial Act of 1881, directing the issuance of a patent to the lands described in the judgment. The court, however, excluded the judgment of confirmation, together with the field notes of a survey of the lands confirmed, holding that appellees could not claim any benefits under the Act of 1881; and upon such ruling of the court appellees assign error."

With commendable zeal and energy, counsel for appellees has incorporated in his brief a summary of the testimony relied on by him as supporting the judgment, which is not controverted by the state's counsel, and is found to be substantially correct. That statement is as follows:

"In 1767, about seventeen years after the original grants to Borrego, the commission, whose duty it was to assign lands to the settlers of Laredo, copied into their proceedings the substance of such original grants. These proceedings are set forth in what is known as 'general visita,' parts of which, making mention of the Borrego grant, were read in evidence. Borrego had applied to Colonel Escandon for a grant of land

to be located within a large body of lowland, lying on the Rio Grande, extending to the Sierrita, about ten leagues to the east. The reservation in the original grant is there stated in the following words: 'And should the king in the future need the land or a part of it for founding some city, town or mission, he shall have the right to take such as may be suitable, reimbursing him with other lands in the manner which may be provided; and in order that the conditions may be certain upon which the said colonel made the grant, he directed in the same decree (which was made in Santander) that they be made known to Don Juan Joseph Vasquez Borrego, son of the petitioner, in order that in accepting them by the authority and orders of his father (which he did in fact accept, as shown in the proceedings) he may bind himself to comply therewith, and he did so before a notary on the twenty-second of said month and year.' And then the commission proceeded to expropriate a part of the lands, basing their right to do so upon the reservation before mentioned, using these words: 'We do assign, in compliance with the petition of these inhabitants, considering the aridity of the country, six leagues around the town, from its center in every direction, without excepting the lands occupied by said Borrego, whom we will hear, and upon showing his lawful right he shall receive compensation for the portion adjudicated to the individuals of this place and taken from his boundaries and incorporated in the six-league tract.' The original grant extended fourteen leagues on the Rio Grande.

"It was admitted by appellant that 'the tract of land known as the Borrego grant is now in the possession of the descendants, heirs and assigns of the original grantee, who with such grantee, Jose Vasquez Borrego, have occupied said land continuously since the time the same was granted, except during intervals when compelled to flee therefrom on account of roving bands of hostile Indians.'

"The living witnesses who testified established the fact that the tracts of land known as San Ygnacio, Corralitos and Dolores constitute what is known as the Borrego grant, the back line of said tracts being the back line of the Borrego grant; that each of the tracts mentioned has a frontage on the Rio Grande of two leagues and a depth extending to the Sierra or Sierrita, which is a line of hills running about fifteen degrees east of north, and lying ten or twelve leagues from the river; and that the general understanding in the neighborhood of the grant and the common report and general reputations as to the boundaries and limits of the grant has always been that the Borrego grant extended back from the Rio Grande to the Sierra. While there is documentary evidence of the original grant, yet much knowledge respecting the grant is doubtless preserved by tradition, since witnesses state facts as if within their knowledge, such as: 'The original grant did not extend back to the Sierra, as the original grant to Borrego extended from Las Manadas to Sabinitos, on the river, a distance of about fourteen leagues. Afterwards the king of Spain took land from the grant to form the towns of Laredo and Guerrera, and Borrego was compensated by his grant being extended further back from the river for depth, the back line of the grant then being placed at the Sierrita.' All the witnesses knew the three tracts of San Ygnacio, Corralitos and Dolores, and they stated

that they are all included in the Borrego grant, and that conveyances of said tracts describing them as having a frontage on the river, 'together with its necessary and recognized depth,' or as having a 'depth running between east and north extending to the hills' (a la Sierra), would be understood as conveying land extending back to the back line of the Borrego grant.

"Some of the witnesses were old men—one eighty years of age, who had seen the lower line surveyed out to the Sierrita in 1854, and remembers that title deeds were shown to the surveyor for his guidance in making the survey.

"Several of the witnesses had testified as to the Borrego grant in 1886 some of those who then testified have since died; one of them was Blas Maria Uriba. He had testified that he was on the land in 1826; that he was present with others and saw the lower line surveyed in 1853 or 1854, out to the Sierrita; and that he saw the field notes of a survey of the land made long before the Trimble survey, but that they were burnt up, the map of the survey only being left.

"A son of Blas Maria Uribe testified that his father had some papers many years ago which he preserved very carefully, because he said they related to the Borrego grant. One of them was an old order of survey signed by Jose de Escandon in 1757. There was attached to this paper what his father called a map. There was another instrument also attached, and these papers were sewed together. These papers were in evidence in the trial.

"The title deeds made in 1829, 1830 and 1831, which were exhibited to a surveyor for his guidance, were identified and read in evidence. They describe the land as having a 'depth extending to the hills,' and as having a frontage on the river 'together with its necessary and recognized depth.' In one of the deeds made in 1830 there is a reference to the act of expropriation in these words: 'Showing also that some leagues were taken in the establishment of this city (Guerrero) by the governor who was then in power, with an assurance of its return by increasing its depth into the vacant lands, they have been restored entire in the new titles conceded by the actual governor.' Also in another place in the same deed conveying a part of the San Ygnacio tract, the following occurs: 'Twelve and a half leagues for large stock and six and a fourth more for small stock, which is the half of the lands belonging to the San Ygnacio tract, pertaining to the estates of the deceased Don Anatascio and Don Macario Borrego as successors of the deceased Jose Vasquez Borrego, original grantee, as appears by the titles renewed the last year by the government of the state.' Also in deed made in 1831, reference is made to surveys as follows: 'Though the general surveys which have been mislaid may be found, yet the said purchaser will have to pay whatever it may cost in case it is necessary to make the same anew.'

"The instrument made in renewal of the titles as stated in the deeds before mentioned, and to which these statements must have referred, was read. It is the instrument containing decrees of the government council and the evidence upon which the council acted; which instrument was given to Vidaurri to serve as title.

"It is important that the various acts and proceedings mentioned in that instrument be considered in chronological order, and to this end the following schedule thereof is prepared:

"August 10, 1828. The alcalde of Laredo orders Marjil Vidaurri to present his titles within forty days.

"August 13, 1828. Vidaurri answers the summons, and asks the alcalde to certify as to the possession of the land and as to what was taken from Borrego on the founding of Laredo. He makes mention of a pending negotiation for a sale of the land which can not be consummated until the question as to title is settled.

"August 14, 1828. Statements of witnesses Blas Maria Diaz and Antonio Gonzales are certified; and also the fact that some land was taken from Borrego in founding Laredo.

"August 19, 1828. Vidaurri requests the alcalde of Guerrero to certify facts as to possession and also as to what land was taken from Borrego in founding Guerrero.

"Same date. Statements of witnesses Rafael Trevino Gutierrez and Victor Sobaron are certified; and also the fact that some land was taken from Borrego in founding Guerrero.

"October 16, 1828. Application is made to the alcalde of Mier for testimony of Alejandro Vidaurri.

"October 17, 1828. Testimony of Alejandro Vidaurri.

"October 20, 1828. Application to alcalde of Guerrero to take depositions of witnesses.

"Same date. Deposition of Teodosio Juarez.

"October 21, 1828. Deposition of Jose Antonio Cuellar Gutierrez.

"Same date. Deposition of Damasio Benavides.

"October 30, 1828. Application to alcalde of Laredo to certify from the visita general, an archive, certain references to Borrego title.

"November 3, 1828. Certificate applied for given.

"Following this is the letter from Escandon to Borrego, dated April 13, 1755.

"December 9, 1828. Vidaurri presents petition to governor of Tamaulipas praying judgment upon the sufficiency of his evidences of title and that he be left in quiet and peaceable possession.

"December 13, 1828. Decree of the government council upon the petition, the same having been referred to Fernandez (Governor).

"Same date. Ordered the decree to be certified for observance.

"December 29, 1828. Decree archived at Guerrero.

"January 3, 1829. Action of alcalde of Laredo upon decree.

"February 12, 1829. Francisco Vidaurri y Borrego, agent and son of Marjil Vidaurri, makes application to alcalde of San Vicente de Abasolo to take depositions of witnesses.

"February 13, 1829. Deposition of Simon Robles. Also deposition of Domingo Reyes. Also deposition of Jose Maria Garcia.

"February 16, 1829. Application to alcalde of San Buena Ventura to take depositions of witnesses.

"Same date. Deposition of Pedro de la Garza.

"February 17, 1829. Deposition of Pedro Galindo. Also deposition of Thomas Sanchez.

"March 12, 1829. Vidaurri makes another petition to governor of Tamaulipas, praying the former decree be ratified, and that the evidence of title exhibited be held sufficient, and that the alcalde of Laredo be ordered to comply with the decree.

"March 13, 1829. Petition referred to the government council.

"March 20, 1829. Decree rendered.

"March 23, 1829. Decree certified for observance.

"May 2, 1829. Alcalde of Laredo orders copy of decree.

"May 6, 1829. Copy remains in Laredo tribunal—the original is sent to the government.

"May 8, 1829. Alcalde of Laredo certifies to correctness of copy remaining in archive at Laredo.

"May 12, 1829. Certificate of alcalde to testimonio made for interested parties at the request of Marjil Vidaurri.

"These proceedings show that in 1828 the Borrego title to San Ygnacio, Corralitos and Dolores was questioned, when on August 10th the alcalde of Laredo required Vidaurri, a descendant and heir of Borrego, to present his title papers. Three days thereafter he answered the summons and mentioned the fact that by reason of the question raised as to his title, a sale which he had negotiated a year before was suspended and that the deed could not be made until he could remove the existing doubts as to his title. He procured evidence that part of the original grant had been taken to found Guerrero, and a part also for founding Laredo. This with other evidences of title secured as to the three tracts constituting the grant, viz., San Ygnacio, Corralitos and Dolores, were presented to the governor with the prayer that they be held sufficient. On December 13, 1828, after due consideration, a decree was rendered holding the evidence sufficient, based partly on the fact of quiet and peaceable possession for a period of sixty-one years. The decree was certified for observance to the alcaldes of Guerrero and Laredo, but the latter refused compliance. Vidaurri then sought other testimony, February 12, 1829, at San Vicente de Abasolo, and took at that place depositions of witnesses, very old men, seventy and eighty years of age, one of whom testified among other things, that about the year 1750, Borrego 'went with his people and property to the State of Tamaulipas, formerly called the Province of Santander, where he knows positively that he denounced lands that the farms of Dolores, Corralitos and San Ygnacio now occupy,' and that he had seen the title papers which were afterwards lost; and that although he had heard his ancestors speak of this often, he heard no one say that Borrego was not the settler of these lands before Laredo and Guerrero was founded. Another testified to the same effect and that they were held by just title, first by Borrego and afterwards by his successors, in quiet and peaceable possession. Another witness eighty years of age testified to the same effect, and said that 'being an intimate friend of the Messrs. Borrego, they several times showed him the titles and papers, and among them he saw and read those appertaining to the three haciendas that he has already mentioned (Dolores, Corralitos and San Ygnacio); that he has heard the ancestors say many times that there had not been any other settlers on the lands which the farms of Dolores, Corralitos and San Ygnacio occupy.' Vidaurri

went also to San Buena Ventura, February 16, 1829, where he secured permission to take testimony. He took depositions there of witnesses who stated substantially what other witnesses before mentioned had already testified to, and spoke of the quiet, uninterrupted and notorious possession of the lands of Dolores, Corralitos and San Ygnacio. Then Vidaurri, with this additional evidence, makes a second petition to the governor praying that the former decree be ratified; that the evidences of title be held sufficient, and that the alcalde of Laredo be compelled to respect the decree. A second decree was rendered upon the evidences submitted March 20, 1829. A copy of it was archived at Laredo. The original was returned to the government, as was directed in the decree, and a testimonio was given to Vidaurri, which is the instrument read in evidence. It will be observed that as soon as this second decree was received in Laredo, Vidaurri was enabled to consummate the sale, the terms of which he had particularly mentioned, making on the 4th day of May, 1829, a deed, conveying the lands of Corralitos and Dolores, in which these tracts are described as having a depth running between east and north, extending to the hills, 'a la Sierra.' Another deed was made May 12, 1830, conveying part of the San Ygnacio tract, describing the tract as fronting on the river, 'together with its recognized and necessary depth,' and another deed was made September 28, 1831. These two last mentioned refer to the renewal of the titles in 1829, as before stated in this brief.

"A sketch of the survey made by Trimble of the San Ygnacio tracts shows that he went to the Sierra for the back line. Adjoining surveys made in 1874 and 1875 call for the boundaries of the grant as claimed by appellees. No one had ever heard or known of a back line of the Borrego grant nearer the river than the Sierra. One witness stated: 'The general understanding among the old people was that the original grant extended from Las Manadas to Sabinitos on the river, but I do not know when the grant was made. It was also the general reputation among the old people that Borrego gave land to the king of Spain to found the towns of Guerrero and Laredo, and that Borrego was then compensated by the back line of the grant being placed where it now is. I have known the Sierrita to be the back line of the grant since 1858.'

"Another stated: 'The common reputation in the neighborhood with respect to the boundaries and limits of said tracts of land (San Ygnacio, Corralitos and Dolores), is that they begin at old San Ygnacio and run to El Toro hill on the Sierra for depth; they have a frontage on the river of six leagues to San Andres canyon. I have known for more than forty years that the Sierrita is the back limit of the grant.'

"Another stated: 'I know the tracts of land called Corralitos, Dolores and San Ygnacio; they have a total frontage on the river of six leagues, and they each extend back to the Sierrita for depth; such is the reputation in the neighborhood of these tracts of land as to their boundaries and limits.'

"Another stated: 'At the time of the institution of this suit and for more than forty years before then, I have known the reputation of the Borrego grant with reference to the location, boundaries, limits,

extent and corners of the grant. The boundaries are such as I have already described them,' fronting six leagues on the Rio Grande, and extending back between eleven and twelve leagues for depth.

"Another stated: 'At the time of bringing this suit and as far back as I can remember, the general reputation in this community and the universal belief and understanding has been that the limits, extent and boundaries of the Borrego grant have been and are as I have described them. I know that the Sierrita, San Ygnacio and the canyon San Andres, are three corners of the grant, because those three corners are well recognized and generally understood to constitute the grant by all people of this community.'

"Another stated: 'I know of no survey making the back line closer than where it was placed by Trimble. I saw a map which Jesus Trevino had and the Sierrita was the back line of the grant, and such was the general understanding about the matter by all in the neighborhood. I know since my earliest recollection that the common report and general understanding among all the people of this community is and has been, that the corners, limits and extent of the grant is and has been as I have already several times stated,' fronting six leagues on the river and extending back to the Sierrita.

"Another stated: 'At the institution of this suit and ever since I can remember before that time, the common reputation and general understanding in this community as to the limits and extent of the Borrego grant were the following: The grant begins at old San Ygnacio and runs *northeast* between eleven and twelve leagues to El Toro hill on the Sierrita; then it follows the Sierrita for about three miles, and then takes a level course, a total width of six leagues; from old San Ygnacio it follows the river a frontage of six leagues to San Andres canyon, and then it runs northeast for depth until it meets the other corner.'

"Another stated: 'All the way from Laredo to Guerrero all the old inhabitants have always understood the limits of the grant as I have stated,' fronting six leagues on the river and extending for depth to the Sierra.

"Another, eighty years of age, stated: 'As I have said before, I have always known that the general understanding in this neighborhood and the common report has always been, that the limits and extent of the Borrego grant were as I have already said several times,' extending back to the Sierrita. This witness was with Trimble (Captain Colorado) when he surveyed the lower line, and speaking of the survey he says: 'I knew Capitan Colorado very well. He is dead. He was a surveyor. In 1854, I remember the date well, he surveyed the lower line of the Borrego grant from old San Ygnacio to El Toro hill on the Sierrita. He was accompanied on that survey by myself, Blas Maria Uribe, Vicente Guiterrez and others. Blas Maria Uribe had his title deeds with him and he showed them to Trimble so that Trimble might make the survey. El Capitan Colorado guided himself in making the survey by those title deeds and observed what the title deeds called for.'

"Two surveyors, Foster and Navarro, were well acquainted with the Borrego grant, and described it as extending to the Sierrita for depth, and stated that the land sued for is a part of the grant as it is generally

known and recognized. Foster attached to his answers a sketch showing surveys on land in controversy which had been involved in litigation, some of them in Texas-Mexican Ry. Co. v. Uribe, 85 Texas, 386.

"All or most of the witnesses testified as to the actual occupancy of the lands sued for, and of the improvements on the land; and A. M. Bruni, one of the appellees, attached a sketch to his answers, showing how and by whom such lands were occupied. He stated further that the only adverse claims of which he had knowledge were in connection with location of land certificates, but no one had ever occupied the lands located or patented, other than those claiming under Borrego; that such surveys, or the most thereof, were mere office surveys; and since the litigation between owners of such surveys and those claiming under Borrego, such claims are not now made.

"The land commissioner's testimony: From him it is learned that patents were issued for lands lying west of the lands sued for within what is admitted to be the Borrego grant, and that for land lying within the tract sued for, patents were refused—the reason for such refusal given at the land office being that the locations were on the Borrego grant. The land commissioner says: 'All I know about the Borrego grant has been from court decisions and the records of the land office. The land in controversy is a part of the Borrego grant, as said grant is delineated on the maps of Webb and Zapata counties now in use in the general land office. It is a fact that the oldest map on file in the land office which shows the Borrego grant delineated by a back line boundary shows the grant about as it appears on all subsequent maps.' The land commissioner, further testifying for the appellant, says: 'According to the official map of Webb County, now in use in this department, it appears that the tract of land (sued for), consisting of about 25,000 acres, is embraced within the boundaries of what is claimed to be the Borrego grant as delineated on said map. Field notes of a survey were filed in this office December 11, 1879, of 50 sitios, of ganado menor, and 25 sitios, ganado mayor, being survey No. 197, made for the heirs and assigns of Jose Vasquez Borrego, by authority of the government of Spain, about the year 1757, by the surveyor of Zapata County, December 8, 1874, to February 14, 1875, and corrected December 1, 1879; and said grant was delineated and placed upon the maps of this office in accordance with said field notes. These field notes, upon examination in the general land office on November 3, 1883, "were found to contain more than sixty-four leagues," while they called for forty-seven and one-fifth leagues only, and for this reason they were not accepted and approved by this office, and for the further reason that the validity of said Borrego grant has never been established to the satisfaction of this department.' The land sued for has been treated and considered a part of the Borrego grant as described in the field notes mentioned.

"As to difference in value of lands, the witnesses testified that those on the river were of greater value than those away from the river, the former giving easy access to water, while in the latter, the only dependence for water was found in artificial reservoirs. One witness said

that he would rather have two acres on the river than three acres back from the river, and that he considered the value in that proportion.

"An examination of the field notes of a resurvey of the Borrego grant, made at the instance of appellant by J. J. Cocke, in May and June, 1902, will show that he followed in the footsteps of former surveyors, and the sketch accompanying his field notes shows the boundaries of the grant about as claimed by appellees.

"Payment of taxes on the grant, as claimed, was shown."

Opinion.—The trial court found as a fact that the land in controversy was granted to Borrego by the Spanish government in about the year 1767; and while no paper grant was produced, we think the finding referred to was warranted by the testimony, under the rules applicable as the presumption of grants. In the very nature of things, it was impossible for the appellee to produce witnesses who could testify upon their own knowledge concerning the possession of the land for a great portion of the time which had elapsed since the date of the alleged grant. But they produced such testimony showing possession for more than forty years before the commencement of this suit, and they produced written documents containing recitals tending to show possession and assertion of ownership in the early part of the nineteenth century, if not as far back as the date of the alleged grant.

In cases of this character, recitals in ancient deeds tending to show possession or other acts of ownership at and prior to the date of such instruments, may be considered as evidence of such facts. 1 Greenl. on Ev. (16th ed.), secs. 108, 189; Boston v. Richardson, 105 Mass., 351; Dunn v. Eaton, 92 Tenn., 743.

With proof of such long continued possession and assertion of ownership by appellees and those under whom they claim, the trial court was fully warranted in presuming that a grant had been made by the government. Taylor v. Watkins, 26 Texas, 688; Yancy v. Norris, 27 Texas, 40; Von Rosenberg v. Haynes, 85 Texas, 357; Texas-Mexican Ry. Co. v. Uribe, 85 Texas, 386; Fletcher v. Fuller, 120 U. S., 534; United States v. Chaves, 175 U. S., 509.

No error has been shown and the judgment is affirmed.

*Affirmed.*

Writ of error refused December 8, 1904.