KIRBY LUMBER CORPORATION et al., Petitioners,

v.

Earl LINDSEY et al., Respondents.

No. B-1206.

Supreme Court of Texas.

June 3, 1970.

Rehearing Denied July 22, 1970.

Walter B. Morgan, Fountain, Cox & Gaines, Joe G. Roady, and Joyce Cox, Houston, for petitioners.

John T. Lindsey, Port Arthur, R. E. Biggs, Liberty, for respondents.

WALKER, Justice.

Kirby Lumber Corporation sued Earl Lindsey et al in trespass to try title to recover 68.38 acres of land in Tyler County. Humble Oil & Refining Company was named as a defendant but adopted Kirby's pleadings and will be referred to as a plaintiff. Aside from a question of limitation that will be discussed later, the rights of the parties turn on the location of the west line of senior Liberty County School Land Survey No. 9, the record title to which is owned by plaintiffs. Defendants are the record owners of the eastern portion of junior E. T. R. R. Co. Survey No. 2, which adjoins Liberty 9 on the west. The jury found that the west line of Liberty 9 was located on the ground by the original surveyor as contended by defendants, and judgment was rendered in favor of defendants on their cross-action for title to and

possession of the 68.38 acres. The Court of Civil Appeals affirmed. 431 S.W.2d 790. We reverse.

The land in controversy, hereinafter referred to as the strip, is cross-hatched on the following plat:

Plaintiffs contend that the evidence establishes as a matter of law that X–Y is the west line of Liberty 9 as located by the original surveyor on the ground. Liberty 9 and Liberty 10 were surveyed by Magruder in 1844. The Wagner and the Aldridge were surveyed by Magruder about four months later in 1845, but the Aldridge was lated abandoned. The E. T. R. R. Surveys 1, 2 and 13 were surveyed by McBride in 1870. McBride also surveyed an E. T. R. R. Survey 14, but the land was not patented on his field notes. The E. T. R. R. Survey 14 shown on the plat was surveyed by M. C. Tatum, County Surveyor of Tyler County, on April 20, 1954.

The work of both, Magruder and McBride was tied on the north to the D. B. Macomb, the most senior of all surveys here involved. Three surveyors testified in the present case and all agree as to the location of the southwest corner of the Macomb at "B", the southeast corner of the Macomb at "A", the southeast corner of Liberty 9 at "D", and the course of the south line of Liberty 9. It is undisputed, moreover, that the northwest and southeast corners of the Wagner are at "N" and "M", respectively. Magruder's field notes of Liberty 9 read as follows:

" * * * Beginning at the S.E. corner of said D. B. Macomb's survey; thence east 950 vs. corner stake from which a black gum 20 in. dia. marked X bears N. 58 E. 15 vs. dis. and a pine marked O bears N. 12 E. dis. 2 vs.; thence south 5000 vs. to corner·stake from which a pine 24 in. dia. marked O bears S. 72 E. 2²⁄₁₀ vs. dis. another pine 18 in. dia. marked X bears S. 47 W. dis. 5⁵⁄₁₀ vs.; thence west at 217 vs. creek bottom, at 640 creek 8 vs. wide course S.W., at 730 vs. same creek, at 900 vs. same creek, at 3700 a branch c. S. at 3900 a branch, at 5000 vs. corner stake from which a pine 10 in. dia. marked O bears S. 28 W. 3⁵⁄₁₀ vs. dis. another pine 8 in. dia. marked X bears N. 63 W. 7⁵⁄₁₀ vs. dis.; thence N. 5015 vs. to corner stake on the south boundary of said Macomb's survey from which a pine 20

in. dia. marked O bears S. 56. E. 5⁴⁄₁₀ dis. another pine 18 in. dia. marked X bears N. 57 E. dis. 9¹⁄₁₀ vs.; thence south 89° 43 min. east 4050 vs. to the place of beginning."

Magruder thus called for the south line of Liberty 9 to run from the southeast corner 5000 varas west, crossing a creek bottom once and a creek three times, with branch crossing farther along the line, to a point for his southwest corner witnessed by pines located S. 28 W. 3.5 varas and N. 63 W. 7.5 varas. His west line was called to run thence north 5015 varas to a point in the south line of the Macomb for his northwest corner, witnessed by pines located S. 56 E. 5.4 varas and N. 57 E. 9.1 varas.

The railroad surveys adjoining Liberty 9 on the west will be referred to by section numbers. McBride's field notes of Section 1 call to begin in the south line of the Macomb at the northwest corner of Liberty 9. He called for witness trees at this point but not those called for by Magruder at the northwest corner of Liberty 9. The field notes of Section 1 run thence south on the west line of Liberty 9, 1900 varas, thence west 1900 varas, thence north 1900 varas, and "thence E. at 1700 vrs. S.W. cor. of said Macomb Survey and 1900 vs. to the place of beginning." McBride thus called for his northeast corner to be 200 varas east of the southwest corner of the Macomb, but the northeast corner of Section 1 as located by him on the ground is 404.46 varas east of the southwest corner of the Macomb. He suspended his Section 2 from Section 1, and Section 13 from Section 2. Each calls to begin in the west line of Liberty 9 at the southeast corner of the adjoining section to the north. The lines of each are called to be 1900 varas in length and to run according to the points of the compass.

■ The three surveyors who testified in the case are Savage, Hunter and Coats. Savage and Hunter were offered by plaintiffs, and Coats was called by defendants. We also have the report of Tatum, who

was deceased at the time of trial. This report is admissible as an exception to the hearsay rule. 2 McCormick and Ray, Texas Law of Evidence, 2d ed. 1956, § 1365. There is little or no dispute as to much of the evidence to be found on the ground. All of the surveyors agree that a marked line between "Z" and "W" is the east line of Sections 1, 2 and 13 as located by McBride. It was assumed for many years that Z-W is the west line of Liberty 9. Beginning in 1949, however, an attempt was made to retrace Magruder's footsteps. The information obtained in the course of this work convinced the owners of Liberty 9 that X–Y is the west line of Liberty 9. Defendants did not agree, and the present suit was filed.

Beginning at "D", the agreed southeast corner of Liberty 9, the line going west substantially fits Magruder's calls for the creek bottom crossing and the three creek crossings farther along. The marked east line of the railroad surveys as placed by McBride on the ground at "W" was determined by one of plaintiff's surveyors to be 4,938.19 varas west of "D". There is no evidence of a corner at 5,000 varas west of "D", and "Y" is 5,153.29 varas west of "D".

Savage did his work in 1949. He surveyed on the ground the Macomb, Sections 1, 2 and 13, Liberty 9 and 10, the Wagner and the abandoned Aldridge. After locating the original southeast and northwest corners of the Wagner, he went north from the latter corner to locate the corners of Liberty 9. At points "X" and "Y" he found what he described as pine stumps precisely corresponding with Magruder's witness tree calls for his northwest and southwest corners.[1] He concluded that Magruder's original corners are at "X" and "Y".

Hunter, who is a surveyor for Kirby, began his work in 1952 and completed it in 1954. He found no pine stumps at either "X" or "Y", but he did find pine stump holes at the courses and distances called by Magruder for his witness trees. The top soil had been scraped off to a depth of perhaps six inches, leaving "the perfect outline of a burned pine stump." In one instance there was a spur root running off from the hole, and in each of the holes he found charcoal sufficiently firm and deep "for any person to determine that it was a pine stump hole."

Tatum reached the same conclusion as Savage had several years earlier. His field notes of Section 14 call to begin for point of reference at the "original SW corner of Survey #9 Liberty County School Land a concrete monument from which a pine stump S. 28 W. 3.5 vs. and a pine stump N. 63 W. 7.5 vs. *original bearings.*"[2] This is point "Y" on the plat. A map attached to Tatum's field notes refers to "Y" as "original corner." As previously indicated, these field notes show that the survey was made on April 20, 1954, and the testimony of Hunter indicates that there were no pine stumps at "Y" on that date. Hunter also testified that Tatum was on the ground at "Y" before 1952, but it is not clear whether Tatum found stumps on an earlier visit or simply determined from what he did find that stumps had stood at the locations mentioned.

1. A. * * * I'm not calling them stump holes because they were stumps or parts of stumps the first time I was there.
    * * * * *
    Q. Now you referred to a stump there and some stumps at point "Y", would you describe those stumps that you found as best you can?
    A. They were at * * * point "Y" at that one stump we had part of a tap root still sticking above the ground and, well, we call them side spurs; they were still sticking above the ground and in the other one they were a slight depression. By cleaning off the slight depression the tap root of the stump was still there.
    Q. How about at point "X"?
    A. At point "X" it was pretty much the same way. Both the—there was evidence; both the stumps still there was enough evidence; there was a stump and not a stump hole.

2. Emphasis throughout this opinion is supplied.

Coats had done other work in the area, but he surveyed the south line of Liberty 9 in 1961. He, like the other surveyors, accepted "D" as the southeast corner and ran west along the south line 4935.46 varas to "W", where he found the marked line running north and south that was established by McBride as the east line of the railroad surveys. He also measured from "W" to "Y", finding it to be 215.10 varas. He found no stumps or stump holes at "Y" but simply excavations that indicated extensive digging. He accepted "W" as the southwest corner of Liberty 9, but he makes it clear that this is based not upon his conclusion as a surveyor but upon recognition by others plus the fact that he himself found nothing more worthy of acceptance. Coats was frank to say that he would have regarded "Y" as the southwest corner of Liberty 9 if he had seen the stumps reported by Tatum.

In summary then, three of the surveyors who worked in the area, Tatum, Hunter and Savage, concluded that "Y" is the southwest corner of Liberty 9. The fourth, Coats, does not question the sufficiency of stumps and stump holes to establish a boundary. He accepted similar evidence in locating McBride's east line of Sections 1, 2 and 13. Coats refused to accept X–Y as the west line of Liberty 9 only because: (1) there is an excess distance between "D" and "Y", and (2) he had not seen the stumps reported by Tatum.

Although Savage was called as a witness by plaintiffs, he did his work in 1949 for the owner of the minerals under the Wagner and Sections 1 and 13. His discovery and reporting of the stumps, as well as the conclusion he reached on the basis of their presence, were adverse to the interests of his employer.[3] The stumps at "Y" were reported by Tatum, who had no demonstrated interest in establishing a conflict between Liberty 9 and McBride's

junior railroad surveys. Evidence of the stumps was also found by Hunter. Coats' failure to find the stumps detracts nothing from the testimony of Savage and Hunter or the report of Tatum but shows only that someone had been digging in the area. The presence of pine stumps precisely corresponding to Magruder's calls for witness trees is established by the evidence as a matter of law.

The evidence upon which defendants must rely is: (1) Coats' acceptance of Z–W as the line; (2) long acquiescence; and (3) McBride's calls placing the corners of Liberty 9 at "Z" and "W". In view of the manner in which Coats qualified his testimony, it is clear that his conclusion is based almost entirely on acquiescence by the adjoining owners. Although he was reluctant to accept X–Y because the distance from "D" to "Y" was "so much excessive," he admitted that excessiveness is the rule rather than the exception. At one point he expressed the opinion that 153.29 varas excess distance from "D" to "Y" is not much considering "the rugged country coming across those creeks" and is very close. In view of the undisputed excess in the east and west lines of Liberty 9, moreover, an excess of 153.29 varas in the south line is much more likely than the shortage of 61.81 varas that would result if "W" were accepted as the corner.

There was never any dispute as to the location of the line before Savage did his work in 1949, and it is clear that the prior acceptance of McBride's marked line was due to the belief that it was the true line. Long acquiescence may support an inference that the parties established the line by agreement, but it does not constitute evidence of the location of the true line in the sense that the trier of fact is always at liberty to conclude that the occupied line is the true line. The applicable rules are stated in Great Plains Oil & Gas Co. v.

---

3. Although not material except on the question of Savage's credibility, it should be pointed out that his work was accepted and the various owners executed agreements establishing: (1) W–Y–3 as the boundary between Section 13 and Liberty 9, and (2) X–4 as the boundary between Section 1 and Liberty 9.

Foundation Oil Co., 137 Tex. 324, 153 S.W. 2d 452, as follows:

> " * * * Long acquiescence in a line is evidence from which it may be inferred that the parties by agreement established such line as the true line, and from such acquiescence a jury or a court may find that the line used is the true line. Bohny v. Petty, 81 Tex. 524, 528, 17 S.W. 80; Schunior v. Russell, 83 Tex. 83, 96, 18 S. W. 484; Note 69 A.L.R. pp. 1430, 1480, 1515. But acquiescence in a line other that the true line will not support a finding of an agreement establishing the line as the boundary when there is no other evidence of agreement than acquiescence and when it is affirmatively shown that the use of the line resulted not from agreement but from a mistaken belief of the parties that it was the true line. Stier v. Latreyte, Tex.Civ.App., 50 S.W. 589; Hunter v. Malone, 49 Tex.Civ.App. 116, 108 S.W. 709; Gulf Oil Corporation v. Marathon Oil Company, 137 Tex. 59, 152 S.W.2d 711. Similarly, *when the true location of the line is conclusively proven, mere acquiescence in another line in the mistaken belief that it is the true line will not support a finding that such other line is the true line.* Buie v. Miller, Tex. Civ.App., 216 S.W. 630 (application for writ of error refused); Thompson v. Allen, Tex.Civ.App., 111 S.W.2d 791."

There is a presumption, of course, that McBride actually surveyed all the lines he called for, including the west line of Liberty 9. See Maddox v. Turner, 79 Tex. 279, 15 S.W. 237. This presumption generally serves the useful purpose of making a junior survey conform to the boundaries of an adjoining senior survey and thus avoiding a vacancy or conflict. It must always be used with due regard for the rule that the recitals in junior surveys cannot be admitted to create an ambiguity in the calls, or change the location, of a senior survey. See Humble Oil & Refining Co. v. State, Tex.Civ.App., 162 S.W.2d 119 (wr. ref.). In this instance the presumption that McBride located the northwest and south-

west corners of Liberty 9 is effectively destroyed by his own reports.

The calls for course and distance in Magruder's field notes of the Wagner, Aldridge and Liberty 10, if given controlling effect, would place the west line of the Wagner 46 varas west of the extended west line of Liberty 9. This relationship between the Wagner and the Liberty 9 prompted Savage to go north from the northwest corner of the Wagner in search of the southwest corner of Liberty 9. It was also known to McBride, who located the south and east lines of his Section 13 as follows: "Thence E. on N. line of same [Section 11] at 1750 vs. branch 4 vs. wide course S.E. and at 1900 vrs. N.W. cor. of A. Wagner's Survey, a stake from which a white oak 20 in. dia. brs. S. 47 E. 4 vs. dist. & a pine 18 in. dia brs. N. 25 E. 4 vrs. dist. Thence N. at 700 vrs. S.W. cor. of Liberty County School League, and at 1900 vrs. the beginning."

The following circumstances show clearly that McBride was mistaken as to the location of the west line of Liberty 9: (1) The northeast corner of Section 1 as located by McBride is 404.46 varas east of the Macomb southwest corner, whereas he called it to be 200 varas; (2) McBride did not call for Magruder's witness trees at the northeast corner of Section 1, but he marked entirely new witness trees; (3) McBride did not call for Magruder's witness trees at the southwest corner of Liberty 9; (4) McBride did not call for Magruder's witness trees at the northwest corner of the Wagner, but he marked entirely new witness trees; (5) McBride called for the southeast corner of Section 13 to be the northwest corner of the Wagner, but the southeast corner of Section 13 as located by him on the ground is 207.73 varas east of the northwest corner of the Wagner— another error of almost exactly 200 varas; and (6) McBride's call for distance on the north line of his Section 14 is almost exactly 200 varas excessive. He called for 2517 varas between "W" and the northwest

corner of Liberty 10. The actual ground distance is 2317.95 varas.

McBride's 200-vara discrepancies in measured distances of 1900 varas cannot be explained as normal excesses. They reflect mistakes of substance and a pattern that could have resulted only from confusion of the surveyor as to where he was on the ground with reference to the corners for which he called. McBride evidently found something at "X" that he took to be the southwest corner of the Macomb. This would explain why he said "Z" was 200 varas east of the Macomb corner, because it is approximately 200 varas on the ground from "X" to "Z". But there is no evidence of any corner having been marked at "X" except the northwest corner of Liberty 9. Since McBride's field notes show that he also thought Magruder's Wagner Survey was approximately 200 varas east of its ground position, it seems likely that he mistook the northwest corner of Liberty 9 for the southwest corner of the Macomb.

■■■ McBride's calls for the corners of Liberty 9 at "Z" and "W" have no probative force, and the acceptance of Z–W as the line over the years was due to the mistaken belief that it is the true line. In our opinion there is no evidence to support the jury's finding that Z–W is the west line of Liberty 9 as located by Magruder on the ground. Without proof identifying and locating Magruder's witness trees, therefore, his calls for distance would control.

If stumps corresponding to Magruder's calls for witness trees had been found only at "Y", this might be written off as a mere coincidence. Here we find: (1) evidence showing conclusively the presence of stumps at both "X" and "Y" that correspond to Magruder's calls; (2) all the surveyor-witnesses agreeing that with stumps in these locations, X–Y is the west line of Liberty 9;

(3) "X" and "Y" are in an appropriate relationship to each other, to the south lines of the Macomb and Liberty 9, to the southwest corner of the Macomb, and to the corners of the Wagner;[4] (4) the presence of the marked line from "Z" to "W" is fully explained; and (5) McBride's reports show that other senior surveys in the area, including two surveyed by Magruder shortly after completing his survey of Liberty 9, are approximately 200 varas west of where McBride thought they were. It is our opinion that these circumstances and the other evidence introduced carry the case beyond coincidence and into the realm of legal certainty, and we hold that the record establishes conclusively that X–Y is the west line of Liberty 9 as located by Magruder. "A reasonable certainty is all * * the law requires. Conviction beyond all peradventure of doubt is unnecessary." Gates v. Asher, 154 Tex. 538, 280 S.W.2d 247, 249.

Defendants also claim title under the three-, five-, and ten-year statutes of limitation. In response to the special issues submitting these contentions, the jury found: (1) that possession sufficient to satisfy the three-year statute began on August 10, 1905, and terminated on August 10, 1908; (2) that possession sufficient to satisfy the five-year statute began on August 10, 1910, and terminated on August 10, 1915; and (3) that possession sufficient to satisfy the ten-year statute began on August 10, 1952, and terminated on August 10, 1962. Plaintiffs say that there is no evidence to support these findings.

Section 2 was patented on August 10, 1905, to J. O. Lindsey, under whom defendants claim. The description contained in the patent is identical with McBride's 1870 field notes. J. O. Lindsey and his family lived on the section from 1902 or 1903 until October, 1915. The land was thereafter rented to various tenants, but the

---

4. The line from "Y" to "X" courses N. 0° 13' 37" E. 5,098.75 varas. "X" is about 15 varas north of the south line of the Macomb as located by the witnesses in this case, and "Y" is some 7 or 8 varas west of the extended west line of the Wagner.

evidence does not show actual, visible and continuous appropriation of the strip for any period of at least three years while the property was under lease.

During the period of occupancy by J. O. Lindsey, an orchard was located partially on the strip and partially on land to the west. The residence, a cultivated field, and all other improvements were west of the strip. The orchard covered about six acres, but there is no proof as to its exact location. John T. Lindsey, the son of J. O. Lindsey, testified that "the major part" of the orchard was on the strip. Hunter had made a search for the orchard and found some old wire and old fence rows. On the basis of the old fence rows, he estimated that less than one acre of the orchard was on the disputed strip.

On April 23, 1914, J. O. Lindsey executed to David L. Gallup, plaintiffs' predecessor in title, an acknowledgment of tenancy covering all of Liberty 9, and any use thereafter made of the land by J. O. Lindsey could not ripen into title by limitation. The record also contains an acknowledgment of tenancy executed to Gallup by E. L. Lowe on January 27, 1908. This instrument covers all of Liberty 9 "on which I now reside." It has been said that recitals in ancient deeds tending to show possession and other acts of ownership at or prior to the dates of the instruments may be received as evidence of the facts. See State v. Bruni, 37 Tex.Civ.App. 2, 83 S.W. 209 (wr. ref.). In this instance the taking and execution of the acknowledgment of tenancy constitutes circumstantial evidence, entirely aside from its recitals, that the person signing the same was in possession. See 1 Wigmore on Evidence, 3rd ed. 1940, § 157; 2 McCormick and Ray, Texas Law of Evidence, 2d ed. 1956, § 1374; Wickes, Ancient Documents and Hearsay, 8 Tex. L.Rev. 451, 453, n. 12. There being no evidence to the contrary, it is presumed that Lowe continued in possession of at least part of Liberty 9 under a tenancy agreement covering the entire survey until

he executed a more restricted acknowledgment on September 13, 1911.

When there is only a partial conflict between surveys, actual possession by the holder of the junior title within his grant but not on the area of conflict is not extended by construction to the boundaries of the junior grant even though the holder of the senior title is not in possession of any part of his grant. Peyton v. Barton, 53 Tex. 298. Where, as here, the owner of the senior grant is in possession of any part of his grant but not extending into the area of conflict, actual possession of part of the conflict will not give the holder of the junior title constructive possession of the entire area of conflict. The latter may acquire title by limitation only to the portion of the conflict actually occupied by him. Anderson v. Jackson, 69 Tex. 346, 6 S.W. 575. Possession and use of the orchard might thus entitle defendants to the land it covered but would not in itself be sufficient to perfect title to the entire strip by adverse possession, and we do not have a legal description of the orchard.

Aside from the orchard, the only use made of the strip was for running cattle and sporadic timber activity. The strip was not enclosed at the time, and it is well settled that limitation title cannot be acquired by grazing unenclosed land. See Orsborn v. Deep Rock Oil Corp., 153 Tex. 281, 267 S.W.2d 781. John T. Lindsey testified that his father "utilized" the timber on the strip until he left in 1915. Rails for fences were split and timber for the house was cut from the land, but the occasional cutting of timber for these purposes or for domestic use will not sustain a claim of title by limitation. See Broom v. Pearson, 98 Tex. 469, 85 S.W. 790; Sellman v. Hardin, 58 Tex. 86; Bartine v. McElroy, 58 Tex.Civ.App. 16, 123 S.W. 1174 (no writ); Haynes v. Texas & N. O. R. R. Co., 51 Tex.Civ.App. 49, 111 S.W. 427 (wr. ref.).

The timber was also sold by J. O. Lindsey to Tyler County Lumber Company

prior to 1911, and at some time not disclosed by the evidence the company cut over the entire section. The company also had a tram road across the disputed strip. "Locomotives ran in there; they had other logging facilities and equipment, teams and so forth." The family had a piling contract with the company and loaded several cars of piling on the railroad. There is no proof, however, as to when or for how long any of these operations were conducted either by the Lindsey family or by the Tyler County Lumber Company. Operation of the tram road coupled with the cutting of timber and other uses of the strip might constitute adverse possession, but the record does not show that this possession continued for at least three years before John T. Lindsey executed the acknowledgment of tenancy on April 23, 1914. See Dargan v. Keystone Mills Co., 126 Tex. 80, 86 S.W.2d 627; Houston Oil Co. v. Billingsley, Tex.Com.App., 213 S.W. 248. We hold that there is no evidence to support the adverse possession findings.

The judgments of the courts below are reversed, and the cause is remanded to the trial court with instructions to render judgment in favor of Kirby and Humble, in accordance with their respective interests, for title to and possession of the tract of 68.38 acres described in the first amended original petition.

Dissenting opinion by REAVLEY, J., joined by CALVERT, C. J., and STEAKLEY, J.

REAVLEY, Justice (dissenting).

The court decides here that McBride was not where he thought he was when he surveyed on the ground in 1870. It decides that all of the adjoining owners have been wrong for eighty years. It rejects the jury verdict and reverses the judgments of the trial court and the court of civil appeals. The west line of Liberty 9 has been moved out to X–Y by scepter of the law.

We accomplish this decree by locating the pine trees which Magruder marked for his west corners in 1844. Actually, no trees are there, and there are no stumps; but two surveyors have testified that they have unearthed the roots of those very same trees. A third surveyor tells us that he has found the holes of the first two surveyors —but nothing more. The third surveyor could find no evidence of the remains of any trees in the ground where the first two had been digging. The significance of roots could be doubted if the third surveyor was correct when he testified that in this particular area "you could go on a given course a certain distance until you could find a set of stump holes that would fit because the country was covered in pine trees."

We choose whom to believe and whom to disbelieve. I had thought that this was the function of the jury.

No other corner of Liberty 9 was located by holes or even by stumps. The other corners from which the court works were located because of long acceptance and usage. A reasonable juror, and maybe lawyer or surveyor, would expect the same factors to be respected on the west line. This W–Z line, always clearly marked on the ground, has been accepted as the actual dividing boundary between the two surveys for over eighty years. Kirby used that line when timber deeds were prepared in 1929 for its purchase of Lindsey timber. Humble leased from Lindsey in 1932 by using the W–Z line. A tenant of Kirby placed his west fence on the W–Z line at the direction of Kirby's agent. Since 1905 when John Lindsey moved on Section 2, the owners of Liberty 9 have cut timber to the W–Z line, and the owners of Section 2 have sold timber to that line. The Lindseys had an orchard on part of the land in dispute for a number of years. Until a company surveyor started redrawing the map in 1949, there was only one west line for Liberty 9 and it was at W–Z.

The jury was entitled to locate the boundary at W–Z. I would affirm the judgment.

CALVERT, C. J., and STEAKLEY, J., join in this dissent.